Estate of Williamina Lennig, deceased.  Appeal of John B. Lennig, Trustee for Maude Lennig, Louise Lennig and Elise Lennig.

*Contract—Assignment of expectant interest—Consideration—Equity.*

A conveyance or assignment of something that does not belong to the grantor, and may never belong to him, is at law inoperative, and in equity must be founded upon a valuable, not merely a good, consideration.

*Decedents' estates—Assignment of interest under will—Consideration.*

An assignment of an expectant interest under a will, made without consideration, in the testator's lifetime, cannot be enforced against the assignors after testator's death.

Testatrix made a will by which she bequeathed her whole estate to a daughter and two granddaughters.  Before testatrix died the three beneficiaries under the will signed a paper by which they agreed that one third of the estate should be divided amongst the children of a son of testatrix.  All of the parties knew the contents of the will at the time the paper was signed.  There was no controversy or dispute between them as to any claim of interest or title which the grantees had or might have in the estate of the testatrix, and the agreement was not based upon any valuable consideration.  *Held*, (1) that the agreement could not be sustained as a family settlement; (2) that it could not be sustained as a gift, because the thing given had no existence; (3) that the fact that the grantees abstained from further efforts to obtain a codicil to the will was not a sufficient consideration to support the agreement as an equitable assignment.

Argued April 1, 1897.  Appeal, No. 101, Jan. T., 1897, by John B. Lennig, from decree of O. C. Phila. Co., Oct. T., 1894, No. 228, sustaining exceptions to adjudication.  Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and FELL, JJ.  Affirmed.

Exceptions to adjudication.

The facts appear by the opinion of the Supreme Court and of the orphans' court.

The auditing judge in awarding the fund to Williamina Thudicum, one third; to Williamina Fullerton and Joyeuse Sweet, in equal shares, one third; to Maude, Louise and Elise Lennig, children of John B. Lennig, one third, said:

The project which ended in the agreement originated with the grantors themselves; they executed the paper with every pos-

sible opportunity for caution; they retained it for weeks after its execution; and they finally, of their own accord, delivered it to the counsel who had prepared it, and who was as much the agent of the children as of themselves. The reason which they assigned for their undertaking was contradicted by the contract and denied by the executor, who they said had suggested it; and was a reason, moreover, which, if it had come from him, would have demonstrated his mental unfitness to act as executor at all. Even if, in spite of the contradiction and the denial, the reason was genuine, the grantors failed to explain why, in order to save the executor a loss of $10,000, they knowingly gave to his children a fortune of $60,000. The auditing judge believes, notwithstanding their disclaimer, that the legatees when they executed the deed were animated by the single motive of providing for relatives who had been deprived of their expectancy. They must be held to the provisions of the deed accordingly.

The legatees having thus determined for themselves the interest which they shall respectively take in the estate of the decedent, have relieved the case of a question of some difficulty which would otherwise have arisen under the will.

The testamentary direction was that the residuary estate should "be divided share and share alike between my daughter Williamina and my two granddaughters Joyeuse and Minnie." Did this mean that the legatees were to take per capita or per stirpes? The rule is that the statute of distributions is to be followed where the case will permit, and hence that a gift to be divided among parties standing in different degrees of relationship to the testatrix will go them per stirpes. But if the gift is to be equally divided the division will generally be per capita: 2 Jarman on Wills, 32; Phillips v. Garth, 3 Bro. C. Cas. 69. . . .

The claim under the agreement is within the jurisdiction of the orphans' court, because the claim is directly in the line of distribution. The agreement itself is in the nature of a family settlement; it was executed during the pendency of a controversy connected with one will, and it was followed by a contest over another will, both of which involved, in a greater or less degree, the interest of the contracting parties. It gave to children an interest in the estate, which they had proposed to secure

by inducing the testatrix to modify her will; and it was founded in part upon the consideration that the children would refrain from pursuing that remedy. It was in every sense a valid agreement. The understanding among grantors, if there was one, that it was revocable, was not communicated to the grantees; and the latter may appeal to the expressed terms of the agreement, under the rule that, "if parties understand a contract differently, and neither of them lets the other know what his understanding is, and the agreement was reduced to writing and executed, they are bound in equity as well as law by that agreement:" Hollingsworth on Contracts, 145; Arnold v. Arnold, 14 Ch. Div. 270.

It was said at the audit that the entire reduction in the shares of the legatees will fall upon the grandchildren; the parties when they executed the agreement having assumed that the daughter's interest under the will was one half of the residue and that each of the granddaughter's was one quarter. In that event the daughter would relinquish one sixth of the estate in order to make up the portion of the Lennig minors. A per capita distribution under the will, which the auditing judge thinks the only true one, denies her right to the one sixth altogether. The result is the same, because the per capita distribution gives her one third, which is precisely what she expected to get, and what the grandchildren agreed to give her, on the basis of a stirpital division.

The opinion of the orphans' court, of PENROSE, J., was in part as follows:

The will of the testatrix, executed in the lifetime of her husband, gave her estate to her daughter and the two children of a deceased daughter, in equal shares. The husband died in January, 1891. His will, disposing of a large estate, appointed a son executor, with the stipulation that his compensation should not exceed $10,000, making no other provision for him, for the reason, as it stated, that he had "while living amply provided for" him. His widow, the present testatrix, elected to take against the will, and, it is said, the estate passing under her will is that which she thus acquired.

Within a few days after the husband's death, and about the time she had determined not to accept the provisions of the will,

the daughter and the wife of the son agreed that a codicil to
her will should be prepared for execution by her, altering the
will so that the estate passing under it should go to the daugh-
ter, the two granddaughters and the children of the son per
stirpes.   This was done without consulting with her and with-
out any knowledge on their part of her wishes.   She was then
extremely ill, and when the paper so prepared was submitted to
her it was not executed.   It was then suggested that the pur-
pose of the proposed codicil could be accomplished by an agree-
ment on the part of those to whom, as it was said, the will would
give her estate to share it with the son's children; and Mr.
Freedley, who had drawn the unexecuted codicil, was asked to
prepare such an agreement. . . . The agreement prepared by
Mr. Freedley recited as a fact that the will of Mrs. Lennig had
been executed at a time when she supposed ample provision
would be made for the son's children by the will of her husband,
and that since his death it had been found that this was not.
done ; that a codicil had been prepared to correct this, but to
obviate the necessity " of any such codicil, it has been agreed
between the parties hereto, being the devisees under the will of
Mrs. Lennig, to invest the children of the said John B. Lennig
with a proportionate share divided in the following manner,"
viz :  one third to the daughter, one third in equal shares to the
two granddaughters and " the other third part thereof shall be
equally divided, share and share alike, amongst the present and
future children of John B. Lennig, and for this purpose shall
be paid to the said John B. Lennig as trustee."

These recitals were drafted by Mr. Freedley, from statements
made to him by the daughter or by the son's wife in his inter-
view with them, and not in consequence of anything said by the
testatrix, who had nothing to do with or any knowledge what-
ever of the transaction ; and this is conceded also with reference
to the granddaughters—one of whom had barely attained her
majority, and the other, but two or three years her senior, resided
out of the state.   The paper, which does not mention the fact
that the codicil spoken of had actually been offered to the tes-
tatrix for execution, was retained by the daughter for some
weeks after its preparation, and having been signed in the mean-
time by her and by the two granddaughters, was finally handed
to Mr. Freedley, who acted throughout as friend, not counsel,

of all the family. It mentions no consideration, but is signed and sealed by the daughter and granddaughters, who, so far as the paper is concerned, are the only "parties thereto." . . . .

It is shown, without contradiction, that all the information which the granddaughters had with regard to the agreement was derived from their aunt, who joined with them in its execution. They saw that what it stated with regard to the reasons influencing the testatrix in making her will was not in accordance with the facts as they understood them, but they were assured by the aunt that the instrument could be revoked at any time, and that it was only intended to become operative in the event that their uncle, whose children it was to benefit, was compelled, by reason of the election of the testatrix to take against her husband's will, to give up the executorship and thus lose the $10,000 which he was to receive as compensation. The absurdity of supposing that the relinquishment of the executorship of the father's will, with its consequent loss of compensation, could in any way result from the election of the wife to take against it is, of course, apparent to a lawyer or even to a man of business; but here were two young women—scarcely more than children—who naturally accepted without question the statement of one standing towards them almost in the relation of mother, and showing her own belief in what she said by her willingness to execute the paper; the effect of which, as they supposed, as she did also, would be to reduce by one third her share, as well as theirs, of what would come from their grandmother. They were undertaking to deal with an estate of which they could not become the owner until the death of the person to whom it then belonged, and they supposed, from information derived from the aunt, that she intended them to have, together, only one half of the estate, and that the other was to go to the aunt. . . .

A formal revocation was afterwards, in the lifetime of the testatrix, executed, the validity of which is denied, and the will of the testatrix, having since become operative by reason of her death, it is now claimed on behalf of the children of the son that they are entitled to the share of her estate called for by the agreement of February, 1891.

That an instrument professing to transfer an expectancy operates not as a present conveyance, but simply as an agreement

to convey, and that its specific performance will not be compelled, after the expected estate has been acquired, unless it is supported by an actual consideration—not one merely technical, such as is imported by a seal, is well settled: Adams's Equity, 78. But, it is said, a valuable consideration is found in the relinquishment of effort to induce the testatrix to execute the codicil. Where does it appear that there was an agreement to relinquish such effort? Whom did it bind? What was there to have prevented the son's children, even if they were of full age—which, it would seem, from the fact that their father was to be their trustee, was not the case—from seeking to induce the testatrix to leave them her entire estate? And if she had changed her intentions in this way, either as the result of importunities or purely of her own volition, what right would the daughter or the granddaughters have had to compel them to share in accordance with the terms of the agreement, or at all? This want of mutuality, in itself, is sufficient to prevent specific performance, even if there were no other reasons. Moreover, the granddaughters having been told that the testatrix had positively refused to execute the codicil changing her original disposition of the estate, for the reason that the son's children did not require anything from her, could not possibly have been influenced by the idea of forbearance from future efforts to change her mind; and, as to them, the agreement is purely voluntary. Whether indeed, even if shown, an agreement not to importune a testatrix whose physical condition was such, in the opinion of her physician, as to make importunity or even application to perform any act of business a source of danger or injury to her health, would, as a matter of public policy, support a promise to convey which a court of equity would enforce, may well admit of doubt.

Nor does the suggestion that the agreement will be enforced as a family settlement seem tenable, unless every agreement between members of a family can be regarded as such. There was no controversy between the parties, and nothing, therefore, which could be the subject of "settlement." It was purely an executory agreement; and, whether enforceable or not, is dependent altogether upon the principles governing courts of equity in applications to compel specific performance: Bayler v. Commonwealth, 40 Pa. 37; 2 Story's Eq., sec. 1040 c. Specific

performance will not be enforced where there is want of mutuality, undue influence, mistake or misapprehension as to the rights of the parties or as to the subject of the agreement, or any other reason sufficient to make enforcement inequitable. It is not as if the parties executing the agreement were seeking its cancelation; much less is required where they are opposing a compulsory performance. Potior est conditio defendentis.

Here, apart from the want of mutuality, the granddaughters acted under a mistake as to the extent of what they were giving up. They supposed that they were parting with one third of what they expected to receive at their grandmother's death, and that in this respect they and their aunt were on a footing of precise equality; while in point of fact they are required to give up one half, and the aunt parts with nothing. They acted also under the mistaken belief, induced by the advice of the aunt, at whose instance they executed it, that the paper was intended to be used only under circumstances which did not arise, and that it was revocable; and they were further influenced by apprehension of incurring the displeasure of their uncle and his family, and being regarded as grasping and ungenerous. Equity will not enforce performance of a contract made under such circumstances, and thus take from persons so young and inexperienced at the time it was entered into half of their inheritance for the benefit of others who gave nothing whatever in return. . . .

The exceptions are sustained and the adjudication corrected accordingly.

*Error assigned* was in sustaining exceptions to adjudication.

*John G. Johnson*, for appellant.—The agreement of February 28, 1891, considered by itself, operated as an equitable assignment, and was binding upon all the parties thereto, and vested in the trustee of the children of John B. Lennig, the right at the death of Mrs. Lennig to receive one third of that portion of her estate which she had derived from her husband : Kennedy v. Ware, 1 Pa. 450; East Lewisburg L. & M. Co. v. Marsh, 91 Pa. 99; Kuhns's Est., 163 Pa. 440; Power's App., 63 Pa. 443; Patterson v. Caldwell, 124 Pa. 455; Bayler v. Com., 40 Pa. 37; Merriman v. Moore, 90 Pa. 78.

The agreement was upon such consideration, and was of such a character, as made it enforceable in equity: Leake on Contracts, 289; Hare on Contracts, 205; Bispham on Equity, sec. 189; Dennison v. Goehring, 7 Pa. 178; Wistar's App., 80 Pa. 495; Power's App., 63 Pa. 444.

The findings of the adjudicating judge were in accordance with the evidence, and must stand unless shown to be clearly wrong, the burden of proof in this respect being upon the appellees : Luce's App., 3 Pa. Superior Ct. 289; Strauss's Est., 168 Pa. 567; Kittel's Est., 156 Pa. 445.

*Leoni Melick*, of *Melick & Potter*, for appellees.—Transfer of an expectancy, invalid at law, requires in equity a valuable consideration : Kuhns's Est., 163 Pa. 438; Bayler v. Com., 40 Pa. 37; Adams' Equity, *78; Bispham, Principles in Equity, sec. 373; Kennedy v. Ware, 1 Pa. 451, Dennison v. Goehring, 7 Pa. 178.

A consideration must be something stipulated for: Hare on Contracts, 135, 216 ; Kirkpatrick v. Muirhead, 16 Pa. 126.

It is conceded that the compromise of family disputes are favorably regarded, but it does not follow that every agreement, merely because the parties thereto are related, will be enforced : Wistar's App., 80 Pa. 495; Grove v. Hodges, 55 Pa. 519; Bispham on Equity, sec. 377; Dornan's Est., 2 W. N. C. 522.

A transaction cannot be considered as a family arrangement, where the doubt existing as to the rights alleged to be compromised are not presented to the mind of the party interested: Harvey v. Cooke, 6 L. J. Ch. 84.

A gift is not executed unless the thing be delivered, or what is the equivalent thereto ; Schiehl's App., 179 Pa. 319.

OPINION BY MR. JUSTICE GREEN, Oct. 11, 1897 :

The subject of contention in this cause is the distribution of a fund constituting the estate of Williamina Lennig, amounting to about $180,000. The decedent left a will wherein she bequeathed the whole of the fund to Williamina Thudicum, a daughter, and two granddaughters, Joyeuse and Williamina Fullerton. These three legatees have the prima facie title to the fund because it is given to them by the will of the last owner, the present testatrix. But the appellant, as trustee for his three

children, claims one third of the fund by virtue of a paper duly executed by the three legatees in the lifetime of the testatrix. The paper is dated February 28, 1891, and the testatrix died September 15, 1893. The contents of the will were known to all the parties at the time of the execution of the paper mentioned. The appellant, John B. Lennig, trustee, was a son of the testatrix and her deceased husband, Charles Lennig, and the three children of the trustee were her grandchildren. The paper in question was an agreement on the part of Williamina Thudicum, Williamina Fullerton and Joyeuse Fullerton that the share of Charles Lennig's estate which the testatrix received as his widow, claiming under the law and against his will, should be equally divided in the following manner, to wit: " One full third part thereof shall be paid to Williamina Thudicum absolutely. One other equal third part thereof shall be equally divided share and share alike between Williamina Fullerton and Joyeuse Fullerton. And one other equal third part thereof shall be equally divided share and share alike amongst the present and future children of John B. Lennig, and for this purpose shall be paid to the said John B. Lennig as their trustee."

After having read all the testimony in the case with most careful attention, we are clearly of opinion that this paper was voluntarily executed by the parties to it, with a full knowledge of its contents, and with the intent that the instrument should do precisely what it purported to. do, to wit: transfer to the children of John B. Lennig through him as trustee, one equal third part of that part of the estate of the testatrix which she derived from her husband's estate. It is perfectly manifest to us that there was no fraud, imposition, mistake, misrepresentation or undue influence, exerted, or existing in the minds of the parties to the instrument, at the time of its execution or at any time afterwards.

Upon this branch of the case we concur entirely with the findings and views of the learned auditing judge, and if the decision of the case depended alone upon these considerations we would reverse the decree, and award the one third of the fund to the appellant as trustee. But there is a fundamental question lying back of the instrument, and the evidence affecting it, which as it seems to us is fatal to the appellant's claim. It is this, and

it arises in this manner : The fund in controversy belonged to the testatrix absolutely and she could dispose of it as she pleased. She has given it to her daughter and her granddaughters, and she refused to give any part of it to the appellant's children, when she had the opportunity to do so by means of a codicil to that effect, which she was asked to sign but refused. We mention this incidentally and not because we think it is vital to the decision. We see no reason to discredit the positive testimony of Dr. Fricke in relation to the codicil which he presented to the testatrix for her signature. The claim of the appellant therefore rests exclusively upon the effect, in any legal or equitable sense, of the paper signed by the daughter and granddaughters of the testatrix. While it must be conceded that, although they were mere expectant legatees at the time they signed the paper, they subsequently became absolute owners of the fund by reason of the testatrix dying without having made any change in her will, yet they now claim that they have changed their minds, that they desire the whole of the estate themselves, that they formally revoked the grant made, by another instrument duly executed, but over and above all, that the instrument they did execute was never obligatory upon them, and conveyed no estate or interest to the appellant or his children. The blunt question therefore arises, can that instrument be enforced against them contrary to their will? If it was a good conveyance, operative from its date, or if it became effectually operative from the death of the testatrix, it could not now be recalled or rescinded by any act of theirs, and hence the formal rescission by the paper of June 12, 1893, is not of very material consequence except as notice that the parties to it were determined to resist all claim under the former paper, and were no longer agreed that the appellant or his children should have or take any part of the fund under the original instrument. The question now recurs, does that instrument confer a good title which can be enforced either at law or in equity? The difficulty about it grows out of the peculiar character of the subject-matter of the instrument. It was an estate in expectancy only. The grantors had no present estate or interest in the property at the date of the grant. It was the property of the testatrix, and she might at any time, up to the moment of her death, revoke her will and give the estate to other persons. The

instrument was therefore an attempted conveyance of something that did not then belong, and might never belong, to the persons assuming to convey it. There are plenty of authorities in relation to this species of assignment or grant, but the sum of the whole of them is that at law they convey nothing, and in equity they must be founded upon a valuable, not merely a good, consideration. In Bayler v. Com., 40 Pa. 37, a married woman, her husband joining, executed a mortgage to secure a debt of the husband, upon all her estate, right, title and interest, which she would be entitled to receive from her father's estate. When, after the father's death, the creditor attempted to enforce it, we held it could not be done, because the estate mortgaged was only an expectancy, that it was invalid at law, and in equity there was no sufficient consideration to sustain it. Strong, J., delivering the opinion, said, " The mortgage given by Mrs. Jay and her husband to Henry Bayler was not a pledge or conveyance of any estate which she owned at the time of its execution. . . . . Her father was then living. In his estate she had no property—no interest. The subject of the mortgage was therefore nothing that she then had. It was a mere expectancy, and the instrument of mortgage was made, not for any consideration then received by her or parted with by the mortgagor, but solely for the purpose of securing a prior debt of her husband. . . . It is an old and well-settled rule of the common law that a mere possibility cannot be conveyed or released ; and the reason given for it is that a release or conveyance supposes a right in being. . . . . At law therefore · nothing passes by a deed of land of which the grantor is only heir apparent. Certainly nothing by its direct operation. But though conveyance of an expectancy, as such, is impossible at law it may be enforced in equity as an executory agreement to convey, if it be sustained by a sufficient consideration." In Power's Appeal, 63 Pa. 443, we said, Reed, J., " An heir or expectant devisee or legatee may, in the lifetime of the intestate or testate, sell or assign his expectant or contingent interest, whatever it may turn out to be, upon the death of a person from whom it may come, which contract, if made upon a valuable consideration, a court of equity will enforce." Citing from Snell's Principles of Equity, p. 72, the opinion proceeds, " A mere expectancy, therefore, as that of an heir at law, to the estate of an ancestor, or the interest which a

person may take under the will of another then living, non-existing property to be acquired at a future time, as the future cargo of a ship, is assignable in equity for a valuable consideration. . . . . The interest which a child has in his orphanage part is a mere contingency, and no present right, and therefore a release of it is not valid in point of law; but if founded on a valuable consideration, it shall operate as an agreement, and be binding in equity."

In Kuhns's Est., 163 Pa. 438, our Brother WILLIAMS, delivering the opinion, said, " At law a valid transfer can be made of anything in actual existence.  What the assignor has he may dispose of.  What he has not, although he may hope or expect to acquire it, he can make no title to.  But such sales and assignments have been sustained in courts of equity whenever good conscience seemed to require it, and not otherwise. . . . If the consideration for such an assignment is a fair and honest one the assignment will be treated as an agreement to transfer when the assignee's title accrues, and it will be held to take effect as an assignment when the expectant interest vests in the assignor. . . . Was the assignment to Julia Ann Kuhns good in equity?  This must depend on the bona fides of the transfer and the adequacy of the consideration."

There is great abundance of authorities to the same effect, and it is not necessary to cite more of them.  They are not really disputed.  Recognizing their force, the appellant contends that, in this case, there was sufficient consideration for the agreement in question on two grounds, (1) because of its being a family settlement, and (2) it led to a discontinuance of efforts to procure the execution of a codicil to the will, in favor of the appellant's children.

We do not see how the paper can be regarded as a family settlement.  There was nothing in dispute; there was no title or claim of title of any kind residing in the appellant's children; there was no doubt existing about any question at issue between the parties as to the title to any interest in the estate of the testatrix on the part of the children of the appellant.  So far as there could be any title or pretense of title before the death of the testatrix, the persons signing the paper were the only persons having any interest whatever.  Their interest was but an expectancy at the best.  While such an interest would have

been sufficient to bind them, it could only do so by virtue of an actual and valuable consideration passing to them from the grantees. But there was no controversy or dispute between the parties about any claim of interest or title which the grantees had or might have, in the estate of the testatrix, and hence we cannot see how the paper can be regarded as a settlement of a dispute or controversy. If they had even a doubtful claim, although it were found afterwards that it could never have been realized, still it would probably be regarded as sufficient to sustain an actual settlement. But here there is nothing which can be regarded as having even the semblance of a claim upon which to raise any kind of a consideration. In Wistar's Appeal, 80 Pa. 495, which was a bill in equity founded upon an agreement which was claimed to be a family settlement, and where actions of ejectment had been brought and were pending for trial when the agreement was made, and in which the master found that the plaintiffs were entitled to the relief sought on the ground that the agreement was of the character claimed, this court reversed the master and court below, and dismissed the bill, Mr. Justice SHARSWOOD, delivering the opinion, said, " It is certainly true that all agreements for the compromise and settlement of family disputes are favorably regarded, both in courts of law and equity, and are supported not only as beneficial in themselves, but as conducing to peace and harmony where it ought most especially to exist. . . . But the principle is not to be carried so far as to work practical injustice. Especially it ought not to override every other rule upon which courts of equity proceed in the enforcement of the specific performance of contracts. A bill for that purpose is always an appeal to the conscience of the chancellor, in which he exercises a sound discretion under all the circumstances, and he will not interfere if the bargain is hard or unconscionable, or the terms unequal, or the complainant is taking an undue advantage from the strict legal construction of the words. . . . In the compromise of family disputes particularly, the agreement of compromise should be complete in itself, not a mere plan looking to a future adjustment of the details; more especially when, so far from settling the family difficulties, it will be itself merely the germ of future litigation. Otherwise, instead of promoting peace and harmony, it may be the source of prolonged discord and discussion."

In the present case it will be observed that the agreement is entirely one-sided. The parties who signed the paper merely gave away their expected rights to the whole estate of the testator, and got nothing in return. The children of the appellant had nothing to give, and did not agree to give any thing. If the paper could be sustained as a gift it would answer the purpose, but that cannot be, because the thing given had no existence, and as a gift, under all the authorities, it cannot be sustained. In Grove v. Hodges, 55 Pa. 519, STRONG, J., said, " Mutuality of obligation is considered perhaps more frequently in courts of equity than those of law. In bills to enforce the specific performance of contracts, which of course have to do with executory contracts, it is a constant inquiry what equities the defendant has against the complainant, and a chancellor will not enforce specifically a contract that is one-sided." In Bispham's Principles in Equity (5th ed.), p. 489, it is said, " It is essential to specific performance that the consideration should be valuable ; a merely good consideration, such as natural love and affection, or the performance of a moral duty, will not be sufficient. Moreover it is necessary that the consideration shall be actual. A constructive consideration, such as that imported by a seal to a bond, will not do." In Kennedy's Executors v. Ware, 1 Pa. 435, GIBSON, C. J., said : " An equitable assignment of a chose in action is said by Mr. Butler (Co. Lit. 232 b. note 1) to be a declaration of trust, with an agreement to permit the assignee to sue in the assignor's name. The contract, being consequently executory, must have a consideration to support it, without which equity would no more execute it than the law would make the breach of it a subject of compensation. . . . . Consanguinity is sufficient to raise a use ; but that that is not a consideration for an assignment like the present is shown by Bret v. J. S. and wife, Cro. Eliz. 756, where it was held that natural affection is not a sufficient consideration for an assumpsit to ground an action. . . . What then was the consideration of the assignment before us ? Kennedy, whose executors are sued on a parol agreement to convey land to his son-in-law, Ware, assigned by the instrumentality of his son, to whom he had conveyed his estate in special trust, a judgment against Avery in advancement of his daughter, Ware's wife. The trust being subsequently revoked and the estate recon-

veyed, Kennedy promised to convey to Ware a particular lot of land in lieu of part of the judgment which was reassigned to him. The judge charged that the promise would sustain the action; but according to the cases brought into view, the first assignment of the judgment being in consideration of natural love and affection was void: and as Ware had nothing in it to give back, Kennedy's promise to convey on the foot of it was also void. The partial rescission of the first assignment was not the compromise of a contested right, and there was therefore no consideration for the agreement on that or any other ground."

For the reasons stated we are unable to regard the instrument in question as a family settlement, or as being founded upon any consideration. The only other point suggested in this connection is the proposition that in consequence of the agreement further efforts to obtain a codicil to the will of Mrs. Lennig were abandoned, and this may be regarded as a sufficient consideration to support the agreement as an equitable assignment. We find ourselves quite unable to assent to this contention. There is no evidence that we can discover of any agreement on the part of Mrs. John B. Lennig, or her children, to desist from further efforts to obtain from Mrs. Lennig the execution of a codicil in favor of the children, and while it may be that no such further effort was actually made because of the agreement, that circumstance could not operate as proof of a restrictive agreement against further efforts. But even if there had been a positive agreement to make no further efforts to obtain a codicil, we cannot regard such a stipulation as a valid condition possessing the force of a valuable consideration. An agreement not to importune an aged and infirm invalid to make a testamentary disposition in favor of a party may be a very proper stipulation for the party to make, because such conduct would be reprehensible upon considerations of policy and sound morality, but that it can be held to be a valuable consideration for the conveyance of an expectancy in the estate of such a person is a very different proposition. While children may reasonably solicit their parents to make a testamentary disposition in their favor, they certainly should not do so at the risk of annoying and distracting such parents or other persons when in conditions of sickness and suffering. It would certainly be an evil

policy for the courts to give countenance to such proceedings by recognizing them as the legitimate basis of a contract right. We cannot regard the argument, or inference of such a result in this case, as the foundation of a lawful right to recover the estate of such a person when deceased, upon the theory that it constituted the basis of a valuable consideration for the assignment of an expectant interest in such estate.

Entertaining these views we are obliged to sustain the decree of the court below, while we would have been very glad to reach a different result if that were possible.

The decree of the court below is affirmed and appeal dismissed at the cost of the appellant.