In the Matter of the Estate of William W. Maull, deceased. Appeal of Louisa R. Maull, the Presbyterian Church of Lewes, Delaware, The Lewes M. E. Church, St. Paul's Episcopal Church of Lewes, Delaware, St. Paul's Colored M. E. Church of Lewes, Delaware and St. George's African M. E. Church of Lewes, Delaware.

*Decedent's estates—Contract—Charitable institution—Evidence of ownership of property.*

A little more than a year prior to his death decedent had made application for entrance to a Home, stating that he was without means, and that by reason of the infirmities of age he could not take care of himself. He signed an agreement in writing that if, after his admission to the Home, he acquired any property, he would assign and transfer it to the institution, and he also agreed that the paper itself should be taken for such assignment and transfer. He also agreed in writing to conform to the rules and regulations of the Home. The rules were printed in a small book, and were not affirmatively shown to have been brought to the knowledge of the decedent. Among the rules was the following: "Those who have any property are required to secure the same to the institution before they are admitted. They will be allowed interest on all moneys secured to the Home (above their admission fee), at the rate of four per cent for sums of from $100 to $500, and for $500 and upwards a less per cent will be allowed. All shall be required to sign the following agreement, transferring to the institution any property they may acquire after admission, in case they remain in the Home." Then followed the agreement for

assigning and transferring to the Home any after-acquired property. It appeared that the decedent had repeatedly stated that he was willing to pay $500, the entrance fee, to become a member, but he was never asked whether he had any other money or property, and no one explained to him that if he did have any other property it was to go to the Home. At the time he made application he had a will already made which he kept till his death, leaving his property, consisting of money and securities, all held in his own name, and in his exclusive possession, to his sister and some churches, but nothing to the Home. Decedent was frequently absent from the Home, and died in another state. *Held*, that the legatees under the will were entitled to the whole estate.

Argued Jan. 13, 1898.  Appeal, No. 284, Jan. T., 1897, by Louisa R. Maull et al., from decree of O. C. Phila. Co., overruling exceptions to adjudication. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ.  Reversed.

Exceptions to adjudication.
The facts appear by the opinion of the Supreme Court.

*Error assigned* was in overruling exceptions to the adjudication of ASHMAN, J.

*Avery D. Harrington,* for appellants.—Counsel for appellants has been unable to find a case exactly like this one, but the courts have uniformly held that a contract, such as the one which is sought to be enforced in this case, will not be raised inferentially or by implication: Graham v. Graham, 34 Pa. 475; Pollock v. Ray, 85 Pa. 428; Walls's App., 111 Pa. 460; Lisk v. Sherman, 25 Barbour, 433.

*Robert H. Hinckley,* for appellee, filed no printed brief.

OPINION BY MR. JUSTICE GREEN, July 21, 1898:
We are unable to agree with the learned court below in their disposition of this cause. The fund in court represented the entire estate of the decedent, William W. Maull, and the whole of it was awarded to the appellee, the Presbyterian Home for Aged Couples. The award was made upon the ground that the appellee was the owner of the whole estate of the decedent. There was no other ground upon which to place the decision, and

none other was alleged.   But in point of fact the decedent, who left a will disposing of all of his estate to other persons, giving nothing to the appellee, was in full possession of the whole estate for a long time before, and up to the very time of his death.   The estate consisted of money and securities, all held in his own name, and in his exclusive possession at the time of his death.   None of the securities had been transferred to the appellee, nor any of the money.   It necessarily follows that the decedent, and he alone, must be regarded as the sole and exclusive owner of all the money and all the securities held by him at the moment of his death.   Moreover, the executor of his will took possession of and administered the estate as the estate of the decedent.   It is very certain that the appellee had no title as owner to any part of the estate during the life of the decedent, and it derived no title to it under his will.   Yet the court below gave to the appellee the whole estate of the decedent, upon the theory that it belonged to the appellee.   When we come to examine the reasoning upon which this conclusion was reached, we find that it is founded upon the proposition that the decedent had become a member of the Presbyterian Home for Aged Couples in January, 1894, and was a member at the time of his death, though he died in the state of Delaware, and did not reside at the Home at that time, and was frequently absent therefrom.   The learned auditing judge found that he had applied for membership in the Home and was admitted, and became subject to its rules and regulations, and as one of these required the applicant to surrender all his property he was bound by that requirement, and concluded that, although that was never done, the Home must now be treated as the owner of the decedent's property, and for that reason, the whole estate was awarded to the appellee.

In stating the subject for consideration the learned judge said : " The single point for inquiry is the contract which was made by the decedent with the home when he came under its charge."   And, again, at the conclusion : " The case is then precisely this : the charities, and the residuary legatee, under that will, all of whom are volunteers, propose to take the fund as against the Presbyterian Home whose demand is based upon a contract made with the testator for a valuable consideration."

While it may be conceded that this is a correct way of stating

the controversy, we do not think the awarding of the whole estate to the appellee, as if it were the owner of the estate of the decedent, is the correct way of solving the question.  If the premises are correct the true solution of the difficulty would be to hold that the decedent had never performed his contract, and therefore his estate would be liable in damages for the breach of the contract.  Those damages should be ascertained in the same manner in which damages are recovered in ordinary actions brought upon contracts of a similar character.  For it is very certain that the contract, as the Home claims it was made, was never performed by the decedent.  He never gave to the Home his moneys, and he never transferred his securities.  As this is not a proceeding to compel specific performance the remedy in that class of cases cannot be administered.  But it is not necessary to discuss this aspect of the case, because we are of opinion that there was grave error in determining what the contract was.  The learned auditing judge treats it as if it was an absolute agreement to convey to the home the entire estate owned by the applicant.  It is certainly not too much to say that if there was any such contract as that between the parties, it ought to be plainly and clearly expressed, so that it must necessarily be understood by the applicant at the time of his admission.  This would be essentially so if the title to real estate were in question, because it would be intolerable that the title of subsequent purchasers or incumbrancers from such a person should be liable to be defeated by showing that at some long, or short, anterior date, the owner had applied for admission to such a Home and had been accepted, without any other evidence of transfer of the title than the mere fact of such application and admission.  Especially would this practical difficulty be enhanced if the applicant, after having been a member of the Home for a year or two, should change his mind and abandon his membership and resume his former mode of living, and after that, some innocent purchaser or incumbrancer should be told that at some former period of his life, his grantor, or borrower, had joined such a Home, and had thereby become divested of all his title to all of his real and personal estate.  But if this test of the right of the Home to hold the estate of such a member would demonstrate the insufficiency of this kind of title, with how much more force would it apply in the case of personalty, the

title to which is transferable by delivery, especially, by sale and delivery to a purchaser?

Recurring however to the literal facts of the present situation, let us see how the matter stands upon such papers or other testimony of an actual contract as appears upon the record.

The first paper which it is claimed that the decedent signed was an application for admission in the following words:

### "FORM OF APPLICATION.

" Mr. ——————————— and wife respectfully make application for admittance to the Home for Aged Couples of the Presbyterian Church. We are without means of support; have no children able to care for us, and by reason of the infirmities of age, are not able to care for ourselves.

"Respectfully,

" ————— aged —————

" ————— " —————

" Members of the ————— Presbyterian Church."

No application signed by the decedent was produced, and the above form of application was not adapted to the case of Mr. Maull as he was unmarried, and no wife was included. But there was testimony that he did sign an application of the above form, and there was also evidence of the destruction of a large quantity of papers, and that possibly Maull's application might have been with them. It certainly is not a very satisfactory kind of testimony upon which to found a claim to the whole of a man's property real and personal. But passing this by for the present, the next paper in evidence is the following:

Copy of agreement signed by Wm. W. Maull, deceased.

" We hereby agree with the Presbyterian Home for Aged Couples and Single Men in the city of Philadelphia, State of Pennsylvania, that in case we acquire any property after my admission to the Home, I will assign and transfer the same to the said corporation, and this shall be taken for said assignment and transfer. I also agree to conform to the rules and regulations of the Home, also to make myself useful as far as

I can.   Witness my hand and seal this first day of October,
A. D. 1894.

"WM. M. MAULL. [Seal]

"Witness: CAROLINE E. RONEY.
"Witness: J. MARGARET JACKSON."

There was proof of the execution of this paper, and by it the
applicant undertook that if, after his admission to the Home, he
acquired any property he would assign and transfer it to the
corporation, and he also agreed that the paper itself should be
taken for such assignment and transfer.   As a matter of course,
this paper cannot operate to transfer any title to any property
which the applicant owned before his application for admission,
but the fact that such a paper was required to be signed at the
time of admission is highly persuasive evidence that the appli-
cant must have supposed that no transfer or assignment of
property previously owned was either claimed or expected.   It
is the strongest kind of negative proof that no such demand
ever was, or ever would be, made of him.   It proves also that
when the home intended to acquire title to property it knew how
to do it by providing for an actual written transfer of title.
But no such, nor any other, transfer of title was provided for, as
to property owned by the applicant before his admission.   In
the application nothing was said upon that subject.   In the
agreement which the applicant signed only property acquired
after admission was provided for.   In order to make out a
claim of title to property owned before admission another and
very questionable method is set up.   It is said that a little book,
containing a copy of the constitution, a few extracts from the
charter, a copy of the by-laws of the association and the rules
prescribing the duties of the matron and the regulations for the
inmates, was handed to the applicant.   Whether he ever read
it is not known.   There was no proof that it was read or ex-
plained to him.   It was simply supposed that he had read it.
But if he did read it there is nothing in the book upon which
any claim of title is founded except the following:

"Those who have any property are required to secure the
same to the institution before they are admitted.   They will be
allowed interest on all moneys secured to the Home (above
their admission fee), at the rate of four per cent for sums of

from $100 to $500, and for $500 and upwards a less per cent will be allowed. All shall be required to sign the following agreement transferring to the institution any property they may acquire after admission, in case they remain in the Home." Then follows the agreement already quoted, for assigning and transferring to the Home any after-acquired property.

The first thought that naturally occurs to one upon reading this provision of the rules is that the securing of the property of the applicant to the institution is a condition precedent to admission, and as nothing of the kind was done in this instance, it is very plain that the performance of this condition was waived and dispensed with, and it never was accomplished. The next thought that presents itself instinctively is that although the property is to be secured there is no kind of provision for a conveyance of the title to any property whatever to the Home, such as immediately follows in relation to property subsequently acquired. In the next place a very astonishing provision is made that the Home is to pay interest on the money received to the applicant. But if the title passed to the Home, so that it became the owner, by the mere fact of admission, how is it possible that the Home is to be regarded as an owner of the property when it must pay interest on its value to the member as long as he remains a member? If the Home is the owner it does not, and cannot, owe the member any interest whatever. And if it is legally bound by its own agreement to pay interest to the member, it can only be because he, and not the Home, is the lawful owner of the money. If any other legal relation than this was intended to be created it should have been provided for in the most clear and express terms conceivable, in order that there might not be any misunderstanding or delusion on the part of the applicant.

It is absolutely impossible to believe that if it had been explained to the applicant, that if he became a member, the whole of his estate, real and personal, would thereby be passed over to the Home, and he would consequently be stripped of everything he possessed, he would for a single moment have entertained the idea of becoming a member. He was willing, and so said repeatedly, to pay $500 to become a member, but not a single word did he ever utter indicating the least willingness to pay another dollar for the privilege of membership.

He said he had $500 which he was willing to pay to the Home for his membership, in consideration that he was to have a large room. He never was asked whether he had any other money or property, and no one explained to him that if he did have any other property it was to go to the Home. From the fact that he had a will and codicil already made, which he kept till his death, leaving his property to his sister and some churches, it must necessarily be inferred that he had not the remotest conception that the whole of his property would be taken from him, and the whole purpose of his will be defeated and frustrated, if he became a member. Nor is it within the limits of possibility to suppose that if he had known that, instead of $500 which he was willing to give to the Home for his membership, he was to pay $4,700 for that privilege he would have considered the subject of membership for an instant. And, yet, unless this was his clear understanding and intention, the proposed method of acquiring title to his property would be nothing but an imposition of the gravest character. Without any gift, without any delivery of any part of the fund or property now claimed by the appellee, without any assignment or transfer of any kind of title to any part of it, without any agreement that he would transfer or assign any part of his property to the Home except the $500 which he agreed to pay, and did pay, and without the least proof that he had ever read or had explained to him the section of the rules under which title is now claimed by the appellee, and in face of the fact that if he had read it he would have found nothing but a provision that if he had any property it was to be so secured to the Home that it should pay him interest on the value of it, and in spite of the fact that the word "secured" does not mean "assigned" or "conveyed" or "transferred," and does not literally mean anything more than obtaining the custody of the property during the time of membership, it would, in our opinion, be a great wrong and a mere mockery of justice to sweep away this estate from the deserving and chosen objects of its owner's bounty. In all the ordinary transactions of life title to property does not pass from one ownership to another without a clearly expressed intent to that effect on the part of the grantor. In this case there was not only no expression of any such intent, but there were the very strongest and most

convincing reasons to believe that no such intent ever would have existed. We are so thoroughly satisfied of this that we are constrained to hold that no title to any part of the fund in question was ever acquired by the appellee, and we therefore reverse the decree of the court below, and award the fund to the legatees named in the will of the testator, according to the terms thereof.

The decree of the court below is reversed at the cost of the appellee and the record is remitted with instructions to distribute the fund in accordance with this opinion.