431 A.2d 1002

**In re ESTATE OF Lillian MUSSELMAN, Deceased.**

**Appeal of HOME FOR HOMELESS WOMEN.**

**Appeal of Margaret TOMKINS, Executrix.**

Supreme Court of Pennsylvania.

Argued April 22, 1981.

Decided July 10, 1981.

Frank Townend, Wilkes-Barre, for appellant at 160 and appellee at 176.

Albert H. Aston, Sr., Wilkes-Barre, for appellant at 176 and appellee at 160.

Before ROBERTS, NIX, LARSEN, FLAHERTY, KAUFFMAN and WILKINSON, JJ.

## OPINION OF THE COURT

WILKINSON, Justice.

This case involves cross appeals from a final decree of the Court of Common Pleas of Luzerne County dismissing the exceptions of the Home for Homeless Women and Margaret Tomkins to the adjudication of the auditing judge in the Estate of Lillian Musselman.

Lillian Musselman, decedent, was admitted to the Home for Homeless Women (hereinafter the Home), a residence for elderly women, on May 14, 1971. Upon admission, decedent signed a document known as the "Book of Registration" which provided that in consideration of the Home's promise to provide and care for her for the rest of her life, she agreed to assign and transfer all her property, then owned or after-acquired, to the Home. The agreement further provided that decedent could be discharged from the Home for failure to abide by its regulations and that in the event the decedent should permanently leave the institution, only the sum of $500 plus $3 per week for the entire number of weeks decedent resided there would be retained by the Home.[1] Presumably, the balance of the individual's estate

1. The agreement states in pertinent part as follows:

   The subscriber, having been received as an inmate of the Home does hereby agree to the rules and regulations of the House as adopted by the managers. And in consideration of the care and attention of the managers and the expense of the establishment, and to the end that the quiet and comfort of the Home may not be disturbed in the event of my removal or death, but that all things may remain for my successors, I do hereby assign and set over to the Home for Homeless Women all money on deposit to my credit

would be returned in the event of a permanent withdrawal. In addition, prior to her admission, decedent paid an entry fee of $4,000 and agreed to turn over one-half of her monthly social security benefits to the Home.

On June 23, 1972, decedent was evacuated from the Home shortly before the flood waters of Hurricane Agnes inundated the entire Wilkes-Barre area. It appears that she spent the next six months living with a friend before the Home secured substitute accommodations for her and other evacuees at the Lutheran Home in Hazleton, Pennsylvania. Decedent entered the Lutheran Home on approximately January 8, 1973, under the terms and conditions of the original agreement, and remained there until her death on April 7, 1973.[2]

It is undisputed that after her initial admission to the Home in May 1971, decedent acquired over $10,000 as coexe-

> in any bank or other depository and all my other personal property whatsoever . . . .
>
> And, whereas, although reduced, in the course of divining Providence to a state dependence, the same kind Providence may hereafter bless me with the accession of property, so as to enable me to retire from this Home, and possibly become a contributor to it, I do hereby further appoint the Treasurer of the above-named Home for the time being my attorney-in-fact to receive for me respectively, and to sell and dispose of all estates, real and personal, of every description to which I shall hereafter or may now be entitled, and to apply and use all the said estates for the support of the said Home; provided only that, if I permanently leave the said institution, then said Treasurer and her successor in office shall retain and use for the purpose aforesaid only the sum of five hundred dollars and such further sum as will reimburse said Home for my board and care at the rate of three dollars per week for the entire time I am and shall be an inmate thereof.

2. The Home entered into an agreement with the Lutheran Welfare Service of Northeastern Pennsylvania, Inc. (the Lutheran Home), shortly after its own physical facilities were destroyed by the flood. Pursuant to the agreement the Lutheran Home agreed to provide facilities and care for former residents of the Home for a period of two years in return for the Home's promise to pay $300.00 per month for each former resident admitted. The residents were to remain subject to and governed by all the rules and regulations of the Home and were not in any manner financially responsible to the Lutheran Home. Documents in the record reveal that decedent indicated to officials of the Home her willingness to be among the first residents to be transferred to the Lutheran Home.

cutrix and legatee of an estate, but failed to transfer any of the after-acquired funds to the Home. Instead, decedent executed a will leaving her entire estate to relatives and friends.

The Home made a claim against the estate contending it was entitled to the entire value thereof [3] by virtue of the terms of the agreement executed by decedent in which she agreed to assign and transfer all presently owned and after-acquired property to the Home.

The court below concluded that because decedent could terminate the agreement, leave the home, and pay "stipulated damages" the same measure of damages would apply in the event of this breach, i.e. failure to transfer after-acquired funds. Accordingly, the Home's claim was allowed in the amount of $500.00 plus $3.00 per week for 96 weeks, a total of $788.00. The Home excepted claiming entitlement to the entire balance of the estate. Miss Tomkins, executrix and legatee under decedent's will excepted claiming that the terms and conditions of the admission agreement were not sufficiently explained to decedent so as to make her aware of the alleged obligations she incurred with respect to after-acquired property and that the auditing judge erred in allowing the claim of the Home in the amount of $788.00. The court below dismissed all exceptions and these appeals followed.

The pivotal issues are the enforceability of the agreement and, if enforceable, the measure of damages. The court below found the agreement enforceable but found the measure of damages to be the amount the decedent would have paid if she had withdrawn from the home.

■ The conclusion reached below is correct as to enforceability but incorrect as to the measure of damages. In Kuhns's Estate, 163 Pa. 438, 30 A. 215 (1894), this Court recognized the enforceability of assignments of after-ac-

3. The Final Account entered by the executrix of decedent's estate listed the balance of principal for distribution as $12,250.13.

quired property against those entitled to take under a will executed by decedent. There the Court stated:

First, can a valid assignment of an expectancy be made? Second, if so, was the assignment made in this case a valid one? .... At law a valid transfer can be made of anything in actual existence. What the assignor has he may dispose of. What he has not, although he may hope or expect to acquire it, he can make no title to because he has no title himself. But such sales and assignments have been sustained in courts of equity whenever good conscience seemed to require it, and not otherwise.... If the consideration for such as assignment is a fair and honest one, the assignment will be treated as an agreement to transfer when the assignee's title accrues, and it will be held to take effect as an assignment when the expectant interest vests in the assignor. The second question affords the only real ground for controversy in this case. Was the assignment ... good in equity? This must depend on the bona fides of the transfer and the adequacy of the consideration.

*Id.*, 163 Pa. at 440–41, 30 A. at 215–16. (Citations omitted.) *Kuhns's Estate* remains valid for the proposition that an agreement to transfer after-acquired property is enforceable as an equitable assignment if supported by valuable consideration and found not lacking in fairness or mutuality. *See Norris's Estate*, 329 Pa. 483, 198 A. 142 (1938); *Maull's Estate*, 186 Pa. 477, 40 A. 1010 (1898); *Lennig's Estate*, 182 Pa. 485, 38 A. 466 (1897); and *Ressler's Estate*, 18 Pa.D.&C. 393 (1933).

The court below placed great weight on a series of inheritance tax cases which considered the taxability of decedents' estates which had passed to charitable homes under life support agreements almost identical to the one involved here.[4] *Swanson Estate*, 3 Pa.D.&C.2d 628 (1955); *Arm-*

4. These inheritance tax cases were decided before transfers to charitable institutions were exempted from Pennsylvania inheritance tax by Section 302 of the Inheritance and Estate Tax Act of 1961, Act of June 15, 1961, P.L. 373, 72 P.S. § 2485–302.

*strong Estate*, 3 Pa.D.&C.2d 285 (1955); and *Stone Estate*, 81 Pa.D.&C. 60 (1952). In each of those cases the lower courts found that the agreements did not amount to an assignment for inheritance tax purposes since there had been no transfer of property to the home during decedent's lifetime. Thus, in each case the property was held taxable as part of the decedent's estate.

Without discussing the validity of the above holdings in an inheritance tax context, suffice it to say that any precedential value of those cases is limited to that area of the law and is not controlling in the case presently before us. In addition, it is important to point out that in all three cases the property in question had actually been transferred to the home by the heirs and there was no dispute as to the validity and enforceability of the agreement between the decedent and the home. The only issue was the effect to be given the agreements for inheritance tax purposes.

Having reached the conclusion that agreements of the type involved here are enforceable if fairly entered into and based on adequate consideration, the remaining task is to review the agreement and the circumstances surrounding its execution.

The auditing judge found that the terms and conditions of the agreement had been explained to decedent on several occasions with sufficient clarity to apprise her of the obligations which she incurred with respect to after-acquired property.[5] The record substantially supports this finding, the only evidence to the contrary being testimony by Miss Tomkins that decedent "never signed anything saying she would leave the Home everything that she had got." Moreover, it is undisputed that decedent signed the "Book of Registration" and answered "yes" to question fourteen contained on the face of that document which provided as

5. In *Maull's Estate, supra,* a similar agreement was held not to constitute a valid assignment because the terms and conditions of the agreement had not been explained to decedent.

follows: "Do you fully understand that if you have now or should receive or inherit any property it must be all surrendered to the Home in case you become a permanent inmate?" [6]

The Home's promise to provide shelter, care, and maintenance to decedent for the rest of her life was adequate consideration for decedent's promise to assign and transfer presently owned or after-acquired property. Indeed, the possibility that the Home might receive more than it expended because of a resident's unexpected legacy will not, in and of itself, render the agreement invalid for lack of adequate consideration or unconscionable as against public policy. *See Ressler's Estate, supra.* Perhaps the most important reason for upholding agreements of this type was best stated in *Fidelity Union Trust Co. v. Reeves,* 96 N.J.Eq. 490, 494, 125 A. 582, 584 (1924), *aff'd* 98 N.J.Eq. 412, 129 A. 922 (1925), wherein the court said:

> [T]he public welfare is better served by upholding contracts of this kind whereby institutions, which care for the aged and tend to relieve the public of their charge, are facilitated in their work for the poor, than to put the ban of the law on them because, perchance, some one of the unfortunates might quite accidentally be favored by the death of a rich relative or friend. And to them the sureness of a home in their declining years far outweighs the advent of any such remote possibility.

Finally, we note that the auditing judge erred in finding that the agreement provided for a set amount of damages in the event a resident died without having transferred all after-acquired property to the Home. The provision relied upon provided that the Home would retain $500.00 plus $3.00 per week in the event a resident "permanently left the institution." There is a distinction between

6. A similar statement advising decedent of her responsibility with respect to after-acquired property was also contained on the application which decedent filled out prior to signing the "Book of Registration."

the situation where a woman withdraws from the Home and where she dies while still a resident thereof. In the former situation the agreement is rescinded and the Home is entitled to retain the stated amount as additional compensation for the individual's stay, while in the latter situation the agreement remains binding and the Home is entitled to the decedent's estate.

Accordingly, we find that the court below erred in denying the Home's claim for the entire balance for distribution of decedent's estate.

The final decree is vacated and the record is remanded with instructions to effect distribution of the estate in accordance with this opinion.[7] Each party to pay own costs.

NIX and KAUFFMAN, JJ., concurred in the result.

O'BRIEN, C. J., did not participate in the consideration or decision of this case.

7. It is clear that the court below has jurisdiction to direct distribution of the estate in accordance with the agreement between decedent and the Home rather than under decedent's will. *See Way Estate*, 379 Pa. 421, 109 A.2d 164 (1954).