Way Estate.

Argued April 23, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*F. Lyman Windolph,* with him *William W. Litke,*
*H. Clay Burkholder* and *Windolph & Johnstone,* for
appellant.

*R. Paul Campbell,* with him *John R. Miller* and
*Campbell & Miller,* for appellee.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, November 15, 1954:

The pivotal question is whether or not the Orphans'
Court has jurisdiction to determine the validity of a
written agreement executed by two sole beneficiaries
under separate wills.  In settlement and compromise
the parties agreed and stipulated the proportions in
which decedent's estate should be *distributed.*  One of
them subsequently repudiated the agreement alleging
that she had been induced to execute the document
through fraud and misrepresentation.  The court be-
low found against such allegation.  The appellant con-
tends that the Orphans' Court does not possess juris-
diction to decide this question since the litigation is
between *two living persons* and that the issue must be
relegated to the court of common pleas.  This conten-
tion is contrary to specific enactment of the Legisla-
ture and numerous decisions of this and the Superior
Court.

Appellant fails to distinguish between agreements executed by all parties in interest in a decedent's estate relating to its *DISTRIBUTION,* and where the dispute is between a distributee and a living person involving *no* question of distribution of *decedent's estate.* Such latter controversy between living persons, being foreign to a *distribution* of the decedent's estate, must necessarily be relegated to the court of common pleas.

The facts are unduly condensed in the printed record. The undeleted facts, however, as found by the auditor appear in the original record and are approved by the court. The *condensed* facts found by the auditor are: "Alvin J. Way died testate a resident of the Borough of State College, Centre County, Pennsylvania, November 18, 1948. The decedent left a last will and testament dated May 17, 1934, wherein he gave all of his estate unto Hazel Keller, provided she took good care of him during his lifetime, and which will was probated in the office of the Register of Wills of Centre County, Pennsylvania, January 31, 1950. Hazel Keller entered into a written article of agreement dated November 22, 1948, with Robert J. Way, son of the decedent, agreeing to a distribution wherein she should receive 35% of the estate; and, inter alia, that she would not contest the probate of a previous last will and testament of said decedent dated August 17, 1929. That the attorney selected to settle the differences arising between Hazel Keller and Robert Way was the attorney of Miss Keller's choice. Hazel Keller and Robert J. Way specifically sought the services of Mr. Dunaway, a member of the Centre County Bar, to reach an amicable adjustment of their respective rights in the estate of Alvin J. Way, deceased. The said parties did enter into the written agreement of November 22, 1948, providing for distribution as between the par-

ties which was partially carried out insofar as the items of household furniture were concerned. There was no fraud employed to induce Miss Keller to sign such agreement, and she distinctly understood her rights under such agreement. Hazel Keller, at the time of the execution of such agreement, was a person over the age of 21 years. Under the terms of such agreement Hazel Keller is to get 35% of the net estate. There was no mutual mistake of the parties either in fact or in law at the time of the execution of said agreement, the same having been entered into to compromise their differences and to avoid litigation between the parties over the respective wills of 1929 and 1934. The agreement above referred to is the result of the expressed purposes of both Miss Keller and Robert J. Way to compromise their differences but securing the best settlement to Miss Keller that could be gotten without going into court." These findings, including those in the original record, are abundantly supported by the testimony and should not be disturbed: *Harbaugh's Estate,* 320 Pa. 209, 182 A. 394; *Istocin's Estate,* 126 Pa. Superior Ct. 158, 190 A. 382.

That the auditor and court had ample support for their findings is most apparent. A reading of the record confirms their judgment as to credibility of the witnesses. The probated will of August 17, 1929 was professionally drawn. After provision for the payment of debts and funeral expenses and care of the cemetery lot, the residue of the estate is devised and bequeathed to decedent's son, the appellee herein. *He was also appointed executor.* There existed a most friendly relation between father and son.

The May 17, 1934 six line paper, subsequently probated as a will, was holographic. It reads:

"State College, Pa.
May 17, 1934

"This is to certify that at the death of Alvin J. Way Hazel Keller is to have all his estate, providing she takes good care of the said Alvin J. Way during his life time.

(s) Alvin J. Way"

While this document on its face, if duly proved, unquestionably constituted a will, there is ample testimony, if believed, which would invalidate the document as a will upon the grounds of testamentary incapacity, undue influence and fraud. Decedent was aged seventy-eight years at death; appellant was then thirty-nine; decedent had been appellant's "boss" at a college in the borough; she came to live with decedent and his wife as a roomer or boarder; after the wife's death appellant became decedent's "housekeeper"; she continued as such from 1930 to decedent's death in 1948. There is testimony that decedent suffered from a severe heart attack and also had cataracts surgically removed from both eyes. Appellant was obliged to read to decedent. She had and used a letter of attorney from decedent and transacted business for him. At sometime prior to decedent's death appellant consulted decedent's lawyer; she showed him the paper of 1934; the lawyer testified that he told her it looked like a good will, but that he thought she "would have a lot of trouble with it"; he testified that he said this because he had heard rumors of a meretricious relation existing between appellant and decedent and that the son would likely claim there had been undue influence. There was positive testimony, denied by appellant, of flagrant instances of actual moral misconduct; it was asserted that decedent and appellant had lived together as husband and wife. The decedent's lawyer, selected by both parties, was em-

ployed to settle decedent's estate. He testified that the thirty-five per cent division of the estate to appellant was suggested by him because if appellant succeeded in establishing that she was a *common law wife* she would be entitled to one-third of decedent's estate. The lawyer further testified that appellant said "she did not want to go into court, but what she wanted to do was to get the best settlement she could without going into court." It is also understandable why decedent's son would be willing to compromise. Ordinarily any child will desire to avoid publicly besmirching a parent's reputation, especially in the small community where decedent had lived.

The covenants in the agreement of November 22, 1948 are:

"1. The [son, appellee] agrees to pay to the [appellant] as soon as practicable after the execution of this Agreement, an amount equal to thirty-five (35%) per cent of the net estate devised and bequeathed to him by [decedent] in the above mentioned will, said net estate to be determined as follows: (a) All personal property belonging to the estate, other than clothing, jewelry and household furnishings shall be included therein. (b) All real estate shall be included therein and shall be appraised for this purpose at the present fair market value of said real estate. (c) From the gross estate as determined in Paragraphs (a) and (b) above shall be deducted all debts owing by [decedent], the bequests to the Pine Hall Cemetery Association in the amount of Two Hundred ($200.00) Dollars and all inheritance taxes and attorney fees; however, there shall be no deduction for an executor's commission.

"2. The [son, appellee] further hereby bargains and sells, gives and releases to the [appellant] all the household furniture, furnishings and equipment be-

longing to the Estate of [decedent] and presently situated in the premises at 122 South Frazier Street, State College, Pennsylvania, except for a certain few articles to be specially agreed upon between the parties hereto.

"3. The [appellant] agrees that she will not present any claim for services rendered by her to or on account of [decedent], and she further agrees that she will not contest the probate of the above mentioned last Will and Testament of [decedent], dated August 17, 1929, and she further agrees that she will not now or at any future time make any claims to a share in the Estate of [decedent] or attempt to probate any paper or papers purporting to be a later testamentary writing by [decedent], except for such rights as are given her in this agreement."

In violation of her duly executed and sealed covenants, appellant repudiated her agreement and sought to cancel it; she appealed from probate of the 1929 will and caused the paper of 1934 to be probated. The record discloses that the probate of the 1929 will was not *revoked,* but was merely *"opened"* to let in the 1934 will. *The grant of letters to the son as executor of decedent's estate was never vacated or revoked.* The son, as fiduciary, had physical possession of decedent's assets. He, therefore, properly accounted for them as executor. The duty of the Orphans' Court was to direct *DISTRIBUTION* of the decedent's estate. If the Orphans' Court possessed jurisdiction it should pass on the validity of the *agreement.* If the agreement were valid the assets of the estate would be *distributed* in accordance with the agreement and *not* under either the 1929 or 1934 wills. If, on the contrary, the Orphans' Court did not possess such jurisdiction, the award would then necessarily be under the 1934 will. In the latter event, appellee would then be relegated to a suit in assumpsit in the common pleas.

The probate of the 1934 will, after the probate of the prior 1929 will had been *opened,* did not preclude the *distribution* of decedent's estate in accordance with the *agreement.* In the contest over probate, the judge correctly ruled that the agreement could not be considered as preventing *probate.* The agreement affected *distribution* and not probate. In *Carson's Estate,* 241 Pa. 117, 88 A. 311, we said (p. 121) : ". . . The probate of a will without regard to its provisions is one thing; distribution of the estate of the testator in accordance with its terms is another. The former is for the register; the latter is none of his concern. Distribution is for the court alone, and, on distribution, and not before, is the validity of the provisions of a will to be passed upon. . . ."

In *Norris's Estate,* 329 Pa. 483, 198 A. 142, Justice LINN said (p. 492) : ". . . Of course we do not hold that when probate of an instrument, otherwise entitled to probate as a will, is objected to on the ground that its provisions are in conflict with an alleged agreement to make a different disposition of property, probate may be refused on that ground; the law is otherwise: compare Carson's Estate, 241 Pa. 117, 88 A. 311; Galli's Estate, 250 Pa. 120, 95 A. 422; Baum's Estate, 260 Pa. 33, 103 A. 614; Hickman's Estate, 308 Pa. 230, 162 A. 168. . . ."

On the audit of the executor's account, which was before the Orphans' Court because the fiduciary had never been removed and was in possession of the assets, the fund was properly before the court for *distribution.* Both wills and the agreement were in evidence. The auditor and the learned Orphans' Court correctly decided that the Orphans' Court possessed jurisdiction. *Distribution* was directed in accordance with the agreement.

There has been an Orphans' Court in Pennsylvania since at least 1683. It was early provided in Ch. LXXVII. Duke of Yorke's Book of Laws 131: "That the Justices of each respective County Court, shall sitt twice every year, to inspect and take Care of the Estates, usage, and Employment of Orphans, which shall be called The Orphans' Court, and sitt the first third day of ye weeks, in the first and eighth month yearly; That Care may be taken for those, that are not able to take care for themselves."

Under the Act of May 19, 1874, P. L. 206 sec. 1, 20 PS 2081, the Legislature enacted that in every county there should be organized a court of record to be known as the Orphans' Court.

The Orphans' Court, being a court of limited jurisdiction, exercises only such power as is given by statute, *expressly or by necessary implication*: *Cutler's Estate*, 225 Pa. 167, 73 A. 1111; *Cutter's Estate*, 286 Pa. 505, 134 A. 489; *Watson's Estate*, 314 Pa. 179, 170 A. 254; *Mains's Estate*, 322 Pa. 243, 185 A. 222; *Mellinger's Estate*, 334 Pa. 180, 5 A. 2d 321.

The Act of June 7, 1917, P. L. 363, 20 PS 2082 et seq., codified all previous acts respecting the Orphans' Court. The Act of August 10, 1951, P. L. 1163, 20 PS 2080.101 et seq., is largely the re-enactment of previous provisions of the Act of 1917, supra. Since decedent died and the proceedings commenced prior to the effective date of the Act of 1951, viz.: January 1, 1952, the prior legislative enactments govern this case. All acts respecting jurisdiction, however, are substantially similar.

Section 9 [e] of the Act of 1917, supra, provides: "The jurisdiction of the several orphans' courts, . . . shall extend to and embrace . . . [e] [*t*]*he distribution of the assets . . . of the estates of decedents. . . .*" (Italics

supplied) Section 9 [n] of the Act specifically conferred jurisdiction by stating: "The exercise of all other powers needful to the doing of anything which is or may be hereafter required or permitted to be done in said court, whether incidental to the powers hereinbefore enumerated *or in addition thereto.*" (Italics supplied)

In a county where there is no separate Orphans' Court, the Orphans' Court is "composed of the judge, or judges, . . . of the court of common pleas . . .": Act of June 7, 1917, P. L. 363 sec. 1 [c], 20 PS 2084.

As early as 1873, in *Dundas's Estate,* 73 Pa. 474, a beneficiary in a decedent's estate filed a petition in the Orphans' Court to set aside a conveyance and sale of his interest in a decedent's estate to a living individual. He alleged that the conveyance was fraudulently obtained. The Orphans' Court refused to act on the ground of lack of jurisdiction. This Court reversed. Justice AGNEW said (p. 480) : ". . . It is very clear, . . . that the Orphans' Court, in a proceeding to distribute an estate among legatees, next of kin and heirs, has ample power to inquire into and determine all questions standing directly in the way of a *distribution* to these parties." (Italics supplied) In the opinion Justice AGNEW quotes Chief Justice JEREMIAH H. BLACK in *Whiteside v. Whiteside,* 20 Pa. 473, who said (p. 474) : ". . . If there be anything besides death which is not to be doubted, it is that the Orphans' Court alone has authority to ascertain the amount of a decedent's property and order its distribution among those entitled to it." Justice AGNEW also quoted Justice LEWIS in *Kittera's Estate,* 17 Pa. 416, where he said (p. 423) : ". . . The power to decide all questions necessary to a proper distribution of the fund follows the power of distribution, and rests in the Orphans' Court, as a necessary incident to the jurisdiction. . . ."

In *McGettrick's Appeal*, 98 Pa. 9, an intestate share was claimed under a deed which was attacked as fraudulent. The Orphans' Court held that it did not have jurisdiction to pass upon the validity of the deed between living persons. This Court *reversed*. Justice GREEN said (p. 12) : ". . . It is, of course, undisputed that the Orphans' Court has exclusive jurisdiction to *distribute* the estates of decedents among those entitled to them. Such *distribution* necessarily includes the power and the duty to ascertain the persons to whom distribution must be made. When the share of one who is apparently entitled is claimed by another, such claim must be established in the *proceeding for distribution,* and as it must be there established, so it may be there impugned. There is no occasion to resort to any other court, or to any other proceeding, to determine the validity of the claim, as the Orphans' Court has full power and adequate procedure to dispose of the controversy. If a deed or other instrument is set up as a muniment of title for the interest of a distributee, an attack upon its validity is in no respect an impeachment of it in a collateral proceeding. A deed is not a proceeding nor the result of one. It is not a judgment of a court, nor a decree of any species of tribunal. *It is but an instrument inter partes, and has no higher sanction than can be given to it by the act of the parties.. As such it must abide the tests of all voluntary contracts.. It is therefore as liable to impeachment as any other form of contractual relation, and is necessarily subject to be invalidated whenever it is proffered to a tribunal as a basis of a right. These considerations are fundamental, and the authorities which prove that the judgment of a Court cannot be impeached collaterally, and is therefore obligatory upon an auditor, have no application."* (Italics supplied)

In *King's Estate,* 215 Pa. 59, 64 A. 324, the Orphans' Court decided that a conveyance of interest of a beneficiary, absolute on its face, was in fact given merely as collateral. The court awarded the share to the distributee, less the amount of the debt. The grantee contested the jurisdiction of the Orphans' Court on the ground that the transaction was between living persons. This Court affirmed. Justice FELL said (p. 61) : ". . . The orphans' court would not have had original jurisdiction to decree specific performance of the agreement to reconvey, but it had jurisdiction of the proceeding by which the fund was created and exclusive jurisdiction of all matters relating to the *distribution* of this fund. The power to *distribute* includes the power to decide all questions necessary to a proper distribution: Dundas's Estate, 73 Pa. 474; McGettrick's Appeal, 98 Pa. 9; Dickinson's Estate, 148 Pa. 142. In McGettrick's Appeal, supra, it was decided that the orphans' court in a proceeding to distribute the proceeds of the sale of the real estate of a decedent among his heirs had the power to determine the validity of a deed by which the share of one of the heirs was conveyed to a stranger." (Italics supplied)

In *Patterson's Appeal,* 116 Pa. 8, 11 A. 70, there was a will contest which proved successful and an intestacy resulted. Certain of the heirs entered into an agreement prior to the will contest with respect to their shares in the event the will was annulled. This Court held (p. 15) : ". . . The heirs of the decedent who are not parties are not affected by its covenants, and they are entitled to their respective shares in the estate, and to the remedies for recovery, provided by the intestate laws. The parties to the covenant could not prevent the partition and sale of the real estate, and the proper place for them to assert their covenant

rights is in the *distribution* of the proceeds. Those who covenanted with Minerva Colestock that she should have the land devised to her in the will, and released to her their interest in the same, are not now entitled to take any of the money arising from sale of that land. They agreed that no distribution should be made to them of any part of the estate given by the will to a blood relation. It was error to disregard the covenant as foreign to all questions arising in the *distribution.*" (Italics supplied)

In *Snyder Estate,* 368 Pa. 393, 84 A. 2d 318, Mr. Justice BELL said (p. 398) : "In proceedings to *distribute* an estate, the orphans' court has jurisdiction to inquire into, and by custom and experience is exceptionally well qualified to determine claims of creditors, legatees, devisees and next of kin, *as well as all questions involving distribution,* and there is no necessity to resort to any other court or to any other proceedings. . . ." (Italics supplied)

In *Brandt's Estate,* 83 Pa. Superior Ct. 322, two real estate brokers claimed commission in sale of real estate, following a contract or agreement with the executor. The Superior Court held that the Orphans' Court had jurisdiction to determine who was entitled to commissions, *since the proceeds from the sale of the real estate were before the court for distribution.*

Where a distributee makes a contract or deals with *his own distributive share,* the Orphans' Court has jurisdiction to pass on the validity of the contract or transfer if the distributee, expressly or impliedly, has *assigned* such distributive interest. The jurisdiction is sustained because by the assignment the *distribution* of decedent's estate becomes involved. Judge HUNTER in his Orphans' Court Commonplace Book, Vol. 1, p. 64, accurately states this phase of the law: "The Orphans' Court in a proceeding to distribute an

estate among legatees, next of kin and heirs, has ample power to inquire into and determine all questions standing directly in the way of a distribution to these parties. Where a legacy has been assigned and is claimed both by the assignee and by the legatee, the assignment thus standing in the way of distribution, there being two claimants to the same legacy or share of it, the jurisdiction of the Orphans' Court necessarily attaches, *in order to remove the barrier to the payment of the legacy.*" (Italics supplied)

Since the agreement here provides for a *distribution* of decedent's estate, no *assignment* is required in order to give the Orphans' Court jurisdiction. Had an assignment been required, such assignment is necessarily *implied* because of the language used in the agreement. In *DeVore's Estate,* 89 Pa. Superior Ct. 47, a contract was executed. There were no *express* words concerning assignment of interest. The Superior Court decided that the agreement was *"in effect"* an assignment. Assignments may also be *implied* from *oral* directions. In *Blose Estate,* 374 Pa. 100, 97 A. 2d 358, this Court so decided in an opinion by Mr. Justice JONES relating to transfer of a bank account.

When a distributee makes a contract affecting his *individual* distributive share *not involving distribution of a decedent's estate* with no express or implied *assignment,* the Orphans' Court has no jurisdiction to settle such a dispute between the contracting living parties. In *Purman Estate,* 358 Pa. 187, 56 A. 2d 86, we said (p. 191): "Ordinarily the orphans' court has no jurisdiction to determine fees between a distributee and his attorney. Such a situation arises between living parties which can only be settled in an action at law where either party has a constitutional right to trial by jury: Murphy's Estate, 258 Pa. 38, 101 A. 935. See

also: Amerling's Estate, 13 D. & C. 582; Anderson's Estate, 51 D. & C. 212."

There is an additional reason why the Orphans' Court had jurisdiction to pass upon the validity of this contract and to *distribute* decedent's estate in accordance therewith. This contract in form and essence constituted a *family agreement or settlement*. It is true that appellant—whatever her true status might have been in relation to decedent—was not related to him either in lineal or collateral consanguinity or affinity. For eighteen years, however, she and decedent. lived together in the same dwelling. The son and his wife frequently visited and stayed with them and, in fact, were living with appellant while decedent was in the hospital, after the death, *and when the agreement was executed.* There was testimony that appellant said that she and the son should be treated as brother and sister; that Edward Benner, a roomer, was present when the will of 1934 was signed, but that he died in 1942, and that Benner was "sort of one of the family."

According to Black's Law Dictionary, Second Edition, a family constitutes "all who live in one house under one head", also " '[f]amily may mean children, wife and children, blood-relatives, *or the members of the domestic circle, according to the connection in which the word is used.'* " Bouvier's Law Dictionary, Eighth Edition: Family, in common parlance consists "of those who live under the same roof with the *paterfamilias.*" The expression is one of great flexibility. It may include "any group constituting a distinct domestic or social body." Webster's Collegiate Dictionary, Fifth Edition: Family: *"The body of persons who live in one house, and under one head; a household."*

In *Beilstein v. Beilstein*, 194 Pa. 152, 45 A. 73, this Court defined the word *family*. Justice Mitchell said

(p. 155): "Family is not a technical word . . . it is a broader word than children. In a very common, if not the most usual sense, it includes all the persons of the same blood who are dwelling together in one household, *and in many cases even the condition of the same blood is not requisite, . . ."* (Italics supplied)

Family agreements or settlements are favorites of the law and when fairly made will not be disturbed: *Edelman's Estate,* 336 Pa. 4, 6 A. 2d 511; *Disston Estate,* 349 Pa. 129, 36 A. 2d 457; *Fry v. Stetson,* 370 Pa. 132, 87 A. 2d 305.

In Bispham's *Principles of Equity,* Tenth Edition, the following principle of law is stated, sec. 189, p. 322: ". . . *compromises* of doubtful rights are favored both in equity and at law, and no relief can be had if it afterwards turns out that the right surrendered was entirely valid and capable of assertion. It has been truly said that every compromise of a right necessarily implies that the party possesses *some* right which is surrendered; and he shall not, therefore, afterwards be heard to complain, if it subsequently appears that his right was more certain and well settled than it was at first supposed to be. . . ."

The agreement was not against public policy. Appellant's agreement, in compromise, not to probate the 1934 document, was not unlawful. The 1934 paper was manifestly a questionable document. But even if it were valid as a will, since appellant was the sole person in interest under its terms, and there were no testamentary restrictive provisions therein, appellant was not precluded from waiving or releasing her interest thereunder. The hearing judge correctly so ruled: *Martin Estate,* 349 Pa. 255, 36 A. 2d 786.

The decree appealed from is affirmed. Costs to be paid by appellant.

DISSENTING OPINION BY MR. JUSTICE ARNOLD:

The Orphans' Court Act of 1951, §301, 20 PS §2080.301, and §702, 20 PS §2080.702, did not enlarge or diminish the jurisdiction of the orphans' court, being merely declaratory of prior law insofar as questions not standing directly in the way of distribution. See Statutory Construction Act, Section 52 (4), 46 PS §552, and §81, 46 PS §581, and *Eiffert v. Pennsylvania Central Brewing Company*, 141 Pa. Superior Ct. 543, 15 A. 2d 723; *Department of Highways of Commonwealth v. Pennsylvania Public Utility Commission*, 141 Pa. Superior Ct. 376, 14 A. 2d 611.

The decisions under the prior statutes establish that the orphans' court has power to determine questions standing *directly in the way of distribution.* See *Dundas's Appeal*, 73 Pa. 474. "When the share of one who is apparently entitled is claimed by another, such claim must be established in the proceeding for distribution . . .": *McGettrick's Appeal*, 98 Pa. 9, 12.

In the instant case nothing stands in the way of distribution to Miss Keller under the second and only probated will. The agreement is not an assignment and she executed no deed of assignment. Nor did she charge any part of her estate (inherited under the second will) with the 65% which Way had agreed to take out of *his* estate under the *first* will. Cf. *Murphy's Estate*, 258 Pa. 38, 101 A. 935; *Purman Estate*, 358 Pa. 187, 56 A. 2d 86; *Stinson's Estate*, 143 Pa. Superior Ct. 512, 18 A. 2d 678. When she probated the second will, with the consequent order of the Orphans' Court of Centre County, the probate became final, and forever afterwards it was the *last will and testament of the decedent.*

Way filed his account as executor under the first will, but whether as administrator c.t.a. or de son tort he does not state. In any event he had no authority

to do anything with the balance for distribution except to pay in accordance with the second will, and then sue Miss Keller in the common pleas for breach of her agreement.

Nothing stood in the way of distribution by Way as fiduciary since there was no assignment of any part of the fund to him, nor any charge by Miss Keller of any payment to him out of the fund. If the agreement means anything it means that Way pays to Miss Keller 35% of *his* share under the *first* will. Since the first will failed he cannot now perform.

Actually the situation is one in which the Orphans' Court of Centre County undertook to award damages to Way for the failure of Miss Keller to perform her contract with him. Ordinarily the orphans' court has no jurisdiction to determine distribution between living parties under an agreement made by them. This can be determined only by a jury trial. Cf. *Murphy's Estate,* 258 Pa. 38, 101 A. 935. This claim of Way is not founded on any contract with the decedent. Instead it is between *two living parties.* Here a dispute exists whether Miss Keller was induced to execute the agreement by fraud or under a misapprehension of the facts. She constantly objected to the reception of the agreement in evidence: first that the orphans' court had no power to decide the issue, and second that there was fraud. The issue is whether Miss Keller had a constitutional right to have that question submitted to a jury. In *DiPaola Estate,* 350 Pa. 408, 39 A. 2d 519, the appellant there cited the administrator of a decedent's estate to deliver to her all of the decedent's personal property claimed as a gift causa mortis from the decedent. It appeared from the evidence that the administrator and the alleged sole next of kin had entered into a binding written agreement two days after the death, whereby the decedent's estate would be di-

vided among the parties to the agreement. The orphans' court found that there was no fraud, accident or mistake in the execution of such agreement. At the time of the signing of the agreement, all the personal property was in the possession of the administrator, except one diamond ring which was in the appellant's possession. The Court held: "In the absence of fraud, accident or mistake the written and sealed agreement of persons of full age and under no legal disabilities may not be disregarded. The appellant has, by the execution of the agreement, precluded herself from the relief which she seeks. The petition was properly dismissed." But the Court added that *"it is also clear that this is not the appropriate proceeding in which to distribute a decedent's estate,"* which must await the audit; that the petition was without notice to creditors or other interested parties and would be without legal effect. (Italics supplied). In other words, in the *Di-Paola Estate* the assets of the decedent were *in the hands of his administrator,* and the petitioner-appellant sought to get these assets *out* of the estate and into her own hands. She was barred by virtue of the agreement which she signed. Thus the orphans' court had jurisdiction to determine whether the claim of the appellant was a bar to the distribution, and held that it was not.

Nor was there an estoppel here. The second will was offered for probate only 14 days after the probate of the first will and a citation issued on Way. Hence there was no deleterious change of position by the appellant. Nor did Miss Keller's exception to Way's distribution and the request for the appointment of an auditor raise an estoppel. She was forced to file exceptions to the distribution, and she had a right to ask for the appointment of an auditor to pass upon the questions. She constantly raised the question that

441

the orphans' court had no jurisdiction to pass upon the validity of the agreement. I accordingly dissent.

Mr. Chief Justice HORACE STERN joins in this dissenting opinion.