George E. BARTOL, Jr., George E. Bartol III, and Central-Penn National Bank of Philadelphia, Executors of the Estate of Mary Rush Bartol, Deceased, Plaintiffs,

v.

Edgar A. McGINNES, Individually and as United States District Director of Internal Revenue for the Internal Revenue District of Philadelphia, Pennsylvania, Defendant.

Civ. A. No. 24596.

United States District Court
E. D. Pennsylvania.

July 19, 1960.

James J. Cloran, Lewis H. Van Dusen, Jr., Drinker, Biddle & Reath, Philadelphia, Pa., for plaintiffs.

Walter E. Alessandroni, U. S. Atty., Philadelphia, Pa., Robert H. Kapp, Asst. Atty. Gen., for defendant.

GRIM, District Judge.

In this case a father and mother [1] gave to their daughter a life interest in and a general power of appointment by will over two trust estates, and provided that the daughter's son was entitled to the two trust estates in default of an exercise of the powers of appointment. When the daughter died, thereby terminating the life estates, the account of the trustees was filed in the Orphans' Court of Chester County, Pennsylvania. In that court the daughter's son contended that there was a default in the exercise of the powers of appointment and that,

[1]. The father by deed of trust dated 1935, and the mother by will dated 1936. The mother died in 1946.

therefore, he, the son, was entitled to the assets of the two trusts. On the other hand, certain trustees named in the daughter's will contended that the powers of appointment were exercised by the daughter's will and that under it they, the trustees, were entitled to the assets of the two trust estates.

Because of the two contentions, the Orphans' Court had before it the question of whether there was a default in the exercise of the powers of appointment, thereby entitling the daughter's son to the assets, or whether the powers of appointment were exercised by the daughter's will, thereby entitling the claiming trustees to the assets. After careful consideration the Orphans' Court decided that there was a default in the exercise of the powers of appointment and it adjudicated the assets to the daughter's son.[2]

■ The question before this federal court is whether federal estate tax was due on the transfer of the assets from the two trust estates to the daughter's son. If the daughter exercised the powers of appointment, federal estate tax was due from her estate. If she did not exercise them, no federal estate tax was due. The daughter's estate contends that the question of whether or not the powers of appointment were exercised is no longer open to decision, even for federal estate tax purposes, because the question was determined by the Pennsylvania state court. The government contends that the question is still open for decision by this federal court and that contrary to the decision of the Orphans'

Court the powers of appointment were exercised by the daughter.

The government contends that the state Orphans' Court was in error in deciding that there was a default in the exercise of the powers of appointment, because to arrive at its conclusion the court considered extrinsic evidence.[3] In my opinion, the government's contention must be rejected. The Orphans' Court in the exercise of its functions had to adjudicate the property rights of the claimants before it. Since it decided these property rights and as part of its decision decided that there was a default in the exercise of the powers of appointment, the question is no longer an open one, even as to the question of whether federal estate tax was due. Gallagher v. Smith, 3 Cir., 1955, 223 F.2d 218.

The government contends that the Orphans' Court decision is not binding here because (it contends) the decision was obtained by collusion. As evidence of collusion it points to the fact that the parties knew that if there were a default in the exercise of the powers of appointment no federal estate tax would be due on them, and also to the fact that under these circumstances none of the parties objected to the Orphans' Court's acceptance of the extrinsic evidence. In my opinion, the facts of the case do not prove collusion. There were strong reasons other than the avoidance of federal estate tax for the failure to object to the extrinsic evidence. The failure to object, in my opinion, was due as much to the fact that everyone in the family seemed to think that this would carry out the

2. The actual names and dates have not been given because they present quite an involved picture and, it seems to me, the picture can be put into better focus by not using them.

3. Apparently in Pennsylvania extrinsic evidence should not be considered in determining whether or not a power of appointment has been exercised by a will. "We cannot subscribe to the taxpayer's contention that the decedent's will 'when read in the light of her grandfather's will creating the power, evidences an in-

tention not to exercise the power.' The 'contrary intent', under the Pennsylvania Wills Act, must appear in the decedent's will and nowhere else. To hold otherwise, would be in flagrant disregard of the express and unambiguous terms of the statute." Keating v. Mayer, 3 Cir., 1956, 236 F.2d 478, 481. It cannot be said, however, that the Orphans' Court was in error here because, as the record in the case and the court's adjudication indicate, the extrinsic evidence was considered by the court only because there was no objection to it.

intentions of the daughter, as it was to tax considerations. Although the Orphans' Court judge was well aware of the rule forbidding the use of extrinsic evidence to determine whether or not a will exercises a power of appointment, he also was undoubtedly aware of the strong public policy that family disputes be settled, if possible.[4]

Plaintiffs have also attacked the action of the government in fixing the value of 1440 shares of common stock of Insurance Company of North America at $125,280 (or $87 a share) rather than at the value stated in the return of $120,960 (or $84 a share).

On the date of death, July 29, 1953, 100 shares of this stock were traded on the American Stock Exchange, on which the stock was and is listed. These shares were traded at a low of 86½ and a high of 87½. The government contends that the correct value was the mean between the high and low prices, or 87.

If the stock were actively traded, there would be no dispute that the government's contention was correct. The evidence showed, however, that while there are 3,600,000 shares outstanding, trading in this stock was not active. It is traded in units of 50 shares. The sales near the date of death were:

| 1953 | Shares |
| --- | --- |
| July 17 | 50 |
| 20 | 150 |
| 21 | 200 |
| 22 | 250 |
| 23 | 200 |
| 24 | 50 |
| 27 | 400 |
| 28 | 50 |
| 29 | 100 |

James D. Wilson, 3d, a partner for 20 years in an investment banking house, testified as an expert witness. He followed the stock very closely and had much experience with it. His father was a member of North America's finance com-mittee for 30 years. Mr. Wilson's opinion was that the fair market value of the block of 1,440 shares was $84 a share at the date of death, that a block of that size if offered on the exchange would have depressed the price approximately 3 points, from the mean of 87 to 84, and that if the stock had been offered at some place other than the exchange, on a "secondary basis", the marketing cost would have been 3½ to 4%.

The applicable rule appears in regulation 20.2031–2:

"(e) *Where selling prices or bid and asked prices do not reflect fair market value.* If it is established that the value of any bond or share of stock determined on the basis of selling or bid and asked prices as provided under paragraphs (b), (c), and (d) of this section does not reflect the fair market value thereof, then some reasonable modification of that basis or other relevant facts and elements of value are considered in determining the fair market value. Where sales at or near the date of death are few or of a sporadic nature, such sales alone may not indicate fair market value. In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotation."

---

**4.** "Family agreements or settlements are favorites of the law and when fairly made will not be disturbed." Way's Es-tate, 1954, 379 Pa. 421, 437, 109 A.2d 164, 172.

■ The executors have shown that the block of 1,440 shares was of a size that would have depressed the price of the stock on the market in the light of the volume of trading occurring at the time of decedent's death and that the amount by which the price would have been depressed reasonably approximated the cost of selling the stock on a secondary basis. I find, consequently, that the fair market value of the stock for estate tax purposes in this case was $84 a share.

Judgment will be entered in favor of plaintiffs and against defendant. On the record the court has insufficient data to determine the amount of the judgment to be entered. This amount can be determined by agreement of the parties, or, if that be impossible, by further proof. Detailed findings of fact and conclusions of law are being filed herewith.