McNeil Tax Assessment Case.

Argued June 12, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*Roger B. Reynolds,* Solicitor, Montgomery County, with him *Anthony J. Giangiulio,* Solicitor, Board of Assessment and Revision of Taxes, for appellant.

*Edward Fackenthal,* with him *William L. O'Hey, Jr.,* and *Henderson, Wetherill & O'Hey,* for appellees.

OPINION BY HOFFMAN, J., November 14, 1968:

The question involved in this case is the calculation of the aggregate actual value of Johnson & Johnson, Inc. (Johnson) common stock owned by appellees,

Robert L. McNeil, Jr. and Henry S. McNeil as of December 31, 1964, for the purpose of the Montgomery County Personal Property Tax.

The Act of June 17, 1913, P. L. 507, Section 1, as amended, 72 P.S. 4821, provides, inter alia, that: "All personal property of the classes hereinafter enumerated, owned, held or possessed by any resident . . . is hereby made taxable annually for county purposes, . . . at the rate of four mills on each dollar of the value thereof. . . ." Section 4.1 of said Act 72 P.S. 4843.1, provides: "(a) For the purpose of ascertaining the amount of tax payable under this act, it shall be the duty of every resident liable to pay such tax on or before the fifteenth day of February of each year to transmit . . . a return certified as provided in this act: (1) The aggregate actual value of each part of the different classes of property made taxable by this act, held, owned or possessed by such resident as of the date fixed annually, in the manner provided herein. . . ."

It is undisputed that the date fixed annually for the valuation of said stock is December 31st and that Johnson common stock is one of the classes of property made taxable by said act.

On December 31, 1964, the common stock of Johnson was selling on the New York Stock Exchange at $111.75 a share. Both appellants filed personal property tax returns in which they valued their shares at thirty per cent less than the value which would have resulted had the full stock market price been employed.

The Montgomery County Board of Assessment and Revision of Taxes (Board) valued these shares at the full stock exchange price of $111.75 resulting in an increased assessment for each of the taxpayers.

The taxpayers appealed to the Court of Common Pleas of Montgomery County. The court, after a full

hearing, ordered that the shares in question be valued at 90% of the stock exchange price. The Board has appealed from that ruling.

In analyzing the contentions of the parties, it becomes necessary to recognize and explore fully the theory which serves as the basis of the taxpayer's case. It is known generally in federal estate gift and inheritance tax law, as "blockage." The theory of blockage is set out in Lowndes & Kramer, Federal Estate and Gift Tax (2nd ed., §18.26, 1962), as follows: "Taxpayers have frequently contended where a large block of stock was to be valued that actual sales at or around the valuation date did not fairly reflect the fair market value of the stock, because they failed to discount the depressing effect which the sale of such a large number of shares would have on the market. This is called blockage. In a blockage situation, the unit of value is still the fair market price of a single share of stock; blockage requires that the price per share be lowered to reflect the effect of marketing such a large number of shares."

The concept of blockage was repudiated by the Internal Revenue Service for many years. It was not recognized until the courts first adopted it. See *Helvering v. Maytag*, 125 F. 2d 55 (1942); *Helvering v. Safe Deposit & Trust Co. of Baltimore*, 95 F. 2d 806 (1938); *Commissioner v. Shattuck*, 97 F. 2d 790 (1938); *Bartol v. McGinnes*, 185 F. Supp. 659 (1960). It has now impliedly been recognized as an appropriate theory by the Internal Revenue Service as evidenced by the federal estate tax regulations which provide at 20.2031-2(e): "In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be

valued. If the executor can show that the block of stock to be valued is so large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations."

Many state courts have similarly recognized the blockage theory in the estate and inheritance tax areas. See *Newberry v. Walsh*, 20 N.J. 484, 120 A. 2d 242 (1956); *Calvert v. Kattar*, 301 S.W. 2d 318 (Tex. Civ. App. 1957); *Citizens Fidelity Bank and Trust Co. v. Reeves*, 259 S.W. 2d 432 (Ky. 1953). Valuation of Corporation Stock for Purpose of Succession, Inheritance or Estate Tax As Affected By Quantity Involved, 23 A.L.R. 2d 775, 787.

Indeed, even here in Pennsylvania, our Supreme Court recognized the blockage theory in inheritance tax cases in *Clabby's Estate*, 308 Pa. 287 (1932). The Court there, while denying blockage to that taxpayer, noted:

"The test is, value at the date of death. But, the value of a few shares of stock on the day of death does not always fix the value of large blocks of stock, in this case over 8,500 shares. . .

"While market quotations on the day of death are evidence of value of stock, they are not conclusive of the actual value of the stock at that time. In fixing value, other evidence having a tendency either to decrease or increase the value as of the day of death is competent and should be considered. The rule for determining value for inheritance taxation contemplates a range of the entire market and the averaging of prices as found running through a reasonable period of time. . . Men who have had experience in selling

stock in lots both large and small are therefore competent to give an opinion as to the effect of dumping a large block of stock on the market. It was therefore competent to show what in the opinion of the experts the value of the stock thus sold would be under actual conditions in business."

Blockage, to date, however, has not been applied in the personal property tax area. No case in any jurisdiction which has discussed the matter has come to our attention.

There are two issues, therefore, for us to determine in this case:

A. Does blockage properly apply in considering the value of shares assessed for the purpose of personal property taxes?

B. If so, did the court properly apply blockage in this case?

A. *Does "blockage" apply in considering the value of shares assessed for the purpose of personal property taxation in Pennsylvania?*

The Board argues that the term "value" as used in the act imposing the personal property tax must be given its ordinary and customary meaning, which is the value established by reference to the stock exchange quotation. In our opinion, the Board's total reliance on the exchange price is unduly restrictive, since it uses a standard without regard to that standard's relevance or meaning.

In using the word "value", the legislature undoubtedly recognized that a corporation's securities are subject to various methods of valuation. Reference might be made to book value, asset value, earnings statements, or any one of the other methods by which stock is valued. In virtually all tax areas, however, the term "value" has been understood to mean fair market value.

Thus, in real estate assessment cases, the Supreme Court has often reiterated that: "The term actual value

means the market value and market value has been defined as the price which a purchaser, willing but not obliged to buy would pay an owner, willing but not obliged to sell. . . ." *Deitch Co. v. Board of Property Assessment*, 417 Pa. 213, 217, 209 A. 2d 397 (1965).

Similarly, as noted in *Clabby's Estate,* supra, involving the Pennsylvania Inheritance Tax, our Supreme Court interpreted the word "value" to mean the fair market value of the stock.

What the Board fails to consider is that the stock market figure is most often employed not because of its inherent infallibility but because, ordinarily, it is the best evidence of fair market value. As we have already noted, however, this quotation may be unreliable in considering the value of large blocks of stock. In those instances, the stock market quotation, if accepted, would represent only fictional fair market value, with respect to the block in question.

The Board suggests that personal property tax should not receive the blockage treatment accorded estate and inheritance taxes because the latter involves a transfer of property. The personal property tax, on the other hand, involves no transfer, and the fair market sales value is purely fictional, since no transfer actually occurs.

There would, perhaps, be some validity to this argument if blockage, in the past, had been recognized only in those estate and inheritance tax cases involving a forced liquidation and sale. In point of fact, however, blockage has been recognized as appropriate even in those situations where estates have not been liquidated, the stock has not been sold, and the valuation is made only for the purpose of tax assessment. See *Newberry v. Walsh,* supra; *Clabby's Estate,* supra. We find no reason, therefore, to recognize blockage in the case of inheritance taxes while ignoring it in the personal property tax area.

A clear and cogent analysis was made by the lower court:

"The court does not agree with the County that this definition excludes the application of the blockage theory. It is virtual certainty that a person owning a 10,000 acre tract would receive less per acre in a sale of the whole tract than if he were to subdivide it and sell it in acre parcels, only if improved. When the Supreme Court stated that actual value means market value it did not intend to break down a given piece of property into its most saleable parcels; but rather, it was describing the value of the tract of land as a whole. The fact that the New York Stock Exchange lists the selling price of individual shares of stock does not conclusively determine what the actual or market value of a given block of stock amounts to. Certainly its quotation is impressive evidence of the market value of a certain company's shares but it can be shown, as here, that other factors operate in determining the actual value of a given block of stock. The blockage rule is an exception to the general rule. Where the evidence establishes that a block of shares, to be valued as of a particular day, is so large that its sale on or during a reasonable period before and after that day would necessarily and substantially have depressed the price of such shares, then the prices recorded on its exchange for such shares on that day will not be conclusive in determining the value of that block of shares on that day. This rule does not exclude evidence as to prices on the exchange but merely permits the consideration of other competent and relevant evidence on the question of fact as to the value of the block of stock."

In summary, in blockage situations, the stock market quotation is the fictional valuation price, whereas the discounted price actually represents fair market

value. We agree, therefore, with the conclusion of the lower court that the blockage rule is an acceptable formula to be used in determining the aggregate actual value of a block of stock for personal property tax purposes, once it has been determined that the stock exchange price does not truly reflect such value.

B. *Did the Court properly apply blockage in this case?*

The considerations in determining whether blockage is to be employed in the federal estate and gift tax area were set out in Lowndes and Kramer, *supra*, at 457. Those considerations are fully applicable in the personal property tax area as well: "The taxpayer must prove by the testimony of expert dealers, stock exchange quotations, and other relevant statistical data, that the effect of marketing a block of securities of the size being valued within a reasonable time of the valuation date would be to depress the market, and the extent to which this would occur. In this connection all the pertinent factors must be considered, such as the size of the block of stock to be valued, the total amount of stock outstanding, the number of shares sold on the valuation date and within a reasonable time before and after that date and whether the market is thin or weak or strong and vigorous. If an amount of stock equal to or greater than the number of shares being valued has been sold within a reasonable period of the valuation date, the stock may be valued according to the price based on all such sales, upon the theory that this is the best evidence of the effect which marketing a block of stock of the size of that being valued would have on the market. . . . This method of valuation, of course, rejects the idea that the entire block of stock will be marketed at one moment and makes use of hindsight, which is usually forbidden in valuation. The courts are, however, taking an increasingly realistic

approach to blockage which is evidenced by the emphasis put upon modern marketing techniques for disposing of large blocks of securities over a reasonable period of time. If secondary distribution by syndicates or through underwriters will prevent any marked break in the market in selling a large block of securities such devices must be taken in account in determining the extent to which market quotations should be discounted for blockage."

In this regard the following facts were found by the court, based on undisputed testimony: On December 31, 1964 Henry S. McNeil owned 189,799 shares and Robert L. McNeil owned 145,910 shares of Johnson common stock.

The price-earnings ratio of Johnson was considerably higher than that of the stocks included in the Dow Jones Industrial stock average, while its price-dividend ratio was very low when compared with that average. Johnson common stock was selling at 309% of book value. Based on these statistics, the court concluded that only a limited number of sophisticated investors would be interested in stock with these characteristics.

Of the 5,959,720 shares of Johnson common stock issued and outstanding, 4,485,159 shares were owned by only 69 shareholders. The remaining shares were owned by 7,649 shareholders. Only 318,300 shares of Johnson stock were traded during all of 1964, or, a little over 1200 a day. This figure, representing 5.3% of the common stock, contrasted sharply with the average percentage of 14.3% for all other listed stocks traded that year.

Based on these findings of fact, the court concluded that if either of the McNeils had attempted to liquidate his stock in a relatively short period of time, the market for Johnson stock would have been depressed in varying degrees based on the method of sale used.

The court further found that "The most practical and economical method of liquidating a large block of Johnson & Johnson, Inc., common stock would be by employment of a 'secondary distribution' in which a large security firm would buy the stock from the seller at a discount and sell it to other firms capable of placing it at a fixed price without commission. By using the secondary distribution method the taxpayers would realize only 90% of the unit market value of their stock."

In reviewing the findings of the lower court, we will ordinarily accept its valuation when there is sufficient evidence to support it based on expert testimony: *Park Drive Manor Tax Assessment Case,* 380 Pa. 134 (1955); *Lehigh v. Wilkes-Barre Coal Company,* 300 Pa. 564 (1930); *Deitch Co. v. Board of Property Assessment,* supra at 222. We do not believe, however, that the testimony presented by the taxpayers' experts was sufficiently precise or comprehensive to support a definitive finding. A careful review of this testimony is necessary for an understanding of our uncertainty in this matter.

All parties in this case are agreed that the appropriate test in determining the value of a block of stock is not the amount which would be realized if all of the shares were dumped on the market on the valuation date. Rather, reference must be made to the most economical manner in which such sales might be transacted. See Lowndes and Kramer, supra; I.R.C. Regulations 20.2031-2(e); *Bull v. Smith,* 119 F. 2d 490 (1941); *Groff v. Munford,* 150 F. 2d 825 (1945); *Newberry v. Welsh,* supra; *Bartol v. McGinnes,* supra.

Two experts testified for the taxpayers. Both considered the effect of either a wholesale dumping of Henry McNeil's block on one day or selling it off over a sixty day period in equal lots. The experts ex-

plained that this volume of trading would cause a suspension of trading and the value of shares would deteriorate greatly.

Ultimately, the taxpayers' experts agreed that a secondary distribution would represent the most practical way of disposing of these large blocks of stock.

They then proceeded to describe the manner and effect of a secondary distribution. They stated that during a period of two to three months prior to the actual distribution, the sellers would enter into negotiations with the underwriters and would register this stock with the U.S. Securities and Exchange Commission. The public knowledge of this large block overhanging the market for an extended period of time would create reticence among buyers, causing the stock price to deteriorate. They estimated that a depressant effect of 6% would result by the date of distribution, December 31, 1964. They further testified that the underwriter, when fixing his purchase price immediately prior to distribution, would impose a further discount of 4% to cover its profit and expense. It was on the basis of these two estimates that the experts stated that the fair market value was only 90% of the quoted price, and this figure was accepted by the lower court.

Our first difficulty arises from the experts' reference to the 6% drop in price prior to distribution. A careful review of the record reflects that this figure was never stated by the taxpayers' experts to be actually applicable to either of the taxpayers.

Thus, at the conclusion of his testimony, expert John B. Weed was asked by the Court: "And most of your questions have been premised upon the block of stock owned by Henry McNeil which is 189 plus thousand shares. Would your answer be different as to the 145,910 share block owned by Robert, if it was used as the premise, instead of Henry's block?

"A. I would say that my answers have been premised on a point about midway between the two. I have been trying to really think of both at the same time.

"Q. Would your answers be any different as to one block as opposed to the other block?

"A. The large block, if anything, would take a slightly larger discount than the smaller block.

"By Mr. O'Hey:

"Q. Did we understand that the six percent suggested as the discount in your opinion would be higher in the case of Mr. Henry McNeil and lower in the case of his brother?

"A. Yes."

Edward F. Ryan, the other expert, was only asked what percentage of decrease would result if Henry McNeil were selling his shares. He answered: "I would say, and I am not parroting Mr. Weed, but I think his 6% figure is a pretty good figure."

This testimony reflects that the 6% referred to in Mr. Weed's testimony represented only the average for the two blocks. He clearly stated that Henry McNeil's block would have a discount larger than six percent and Robert McNeil would have a discount smaller than six percent. No specific figure was mentioned for either of the blocks. Mr. Ryan, the other expert, was never even asked to give his estimate of the depressant effect on Robert McNeil's smaller block. He was only asked about Henry McNeil's block and answered that he agreed with Mr. Weed's 6% figure. As we have already seen, however, Mr. Weed never fixed 6% as the figure for either Henry or Robert McNeil.

The testimony is incomplete, therefore, in that it does not assign specific estimates to each of the blocks, although it is admitted that there would be a variation between the two. Nor should we assume that

the spread between the two would be insubstantial. Henry McNeil owned approximately 44,000 more shares than did Robert. The assessed value of the larger block exceeded the smaller by almost 5 million dollars. The failure of the experts to assign individual values for each block of stock requires a rehearing in this matter.

The further problem in the notes of testimony arises from the failure of the taxpayers to establish that they were part of a control group, as that term has been defined by the federal securities laws. This factor is significant for the following reasons. The experts testified that the market would be depressed because of public knowledge of the impending distribution. They stated further that much of this knowledge would reach the public by reason of registration with the U.S. Securities and Exchange Commission.

Such registration is required in secondary distributions, however, only if a block of a certain size is sold by a person who is in control or part of a group in control of the corporation.[1]

The experts stated that, in their opinions, both McNeils were control parties. There is nothing in the record to support this conclusion, however. Henry McNeil owned approximately 3% of the outstanding stock and Robert McNeil owned approximately 2.5%. Mention is made that Henry McNeil was an officer and director of the company. No reference is made to Robert McNeil's position. This testimony, standing alone, does not establish that these individuals had such control which would necessitate their filing registration statements.[2] Thus, the need for registration,

---

[1] See II Loss, Securities Regulation (1961) at 764.

[2] See II Loss, Securities Regulation, supra at 781. "Accordingly, although a person's being an officer or director does not create any presumption of control, it is a sort of red light. It may

which the experts indicated was significant in their calculations, was never demonstrated.

If such control had been established, however, we believe that one further problem would require analysis. That is, whether the fact that this stock was part of a control block would so enhance its value, that no deterioration would result from its sale. While no case has ever made such a finding, the possibility has been recognized by other courts. See *Whittemore v. Fitzpatrick*, 127 F. Supp. 710 (D. Conn. 1955).

Further gaps in the testimony are found in the experts' failure to discuss various types of block distribution and to indicate why one was preferable to the other.

The taxpayers' experts found, for example, that the most expeditious form of distribution would be a "secondary distribution" involving a firm-commitment on the part of an underwriter to purchase the block. Under this form of underwriting the seller is assured of a set price for his stock by shifting the risk of the market to the underwriter.

The experts, in their direct testimony, however, made no reference to other block distributions such as special offerings or exchange distributions. It was only on cross-examination that Mr. Ryan discussed an exchange distribution, which is, ordinarily, more of a best-efforts form of underwriting. In such distributions the underwriter is not committed to accept the stock at a firm price. No reference is made to the effect it might have on the market, although it is admitted that the commission would be smaller. Moreover, the exchange distribution is dismissed by the

---

take only one or two questions to bring out that a particular officer has no substantial influence, or that a particular director represents a minority interest (perhaps as the result of cumulative voting) which is out of sympathy with the controlling block."

expert as involving "a lesser number of shares, so that the whole operation can be handled by one brokerage firm." He then stated that he did not believe that any one firm was large enough to handle it. This testimony appears contrary to literature of the stock exchanges, however, which reflect that exchange distributions may involve selling groups.[3]

The testimony was again insufficient in that, generally, it considered only Henry McNeil's block in assessing the advisability of the various methods of distribution. The experts did not consider whether another form of distribution might be more appropriate for Robert McNeil's block, which was considerably smaller.

We find, therefore, that the experts, in considering methods of distribution and discounts failed to distinguish between the blocks of Henry and Robert McNeil, although it was admitted that difference in size could affect the results. In addition, the experts failed to fully establish the most appropriate form of underwriting and what federal requirements must be met.

Two further points raised by the Board must be considered by us at this point.

The taxpayers' experts based their valuations on the assumption that negotiations for a secondary distribution would commence prior to December 31, 1964, with the actual sale occurring on December 31, 1964. The Board contends, however, that the value should be determined based on the price which could be procured if placed for secondary distribution on December 31, 1964 and sold approximately eight weeks later.

---

[3] See, for example, the definition of "exchange distribution" at p. 14, of The Language of Investing published by the New York Stock Exchange in January of 1968 which states, in part: "Under certain circumstances a member-broker can facilitate the sale of a block of stock by soliciting and getting other members brokers to solicit order to buy."

We do not agree with the Board. The Court found that the most expeditious manner of distribution involved a firm-commitment underwriting under which the underwriter purchases all of the stock from the seller. As such, the figure upon which the underwriter and seller agree represents what a buyer has, in effect, agreed to pay for this stock on December 31, 1964. It is in perfect accord with the definition of our Supreme Court stating that value is the amount a willing buyer would pay on December 31, 1964. Of course, should the Court determine that a gradual liquidation over a reasonable period of time would be preferred, we would, presumably, consider sales commencing on December 31, 1964 and continuing from that date on. *Cf. Bull v. Smith,* supra. *Newberry v. Walsh,* supra.

Finally, question is raised as to whether the underwriter's commission or costs of sale should be considered in determining the actual value of stock.

The Board points out that in all sales of property, whether real or personal, there are sales costs and commissions. Sales commissions, however, are never considered in determining the actual market value of property. It further points out that fair market value has been defined by the courts to mean the price a purchaser would pay, not the amount received by the owner after deducting sales commissions and other expenses of sale.

The taxpayers, however, argue that in a secondary distribution, the shareholder pays no sales commission, as such. It is the underwriter who is buying the stock at a price low enough to enable him to meet his expenses and make a reasonable profit. Furthermore, the commission and expenses incurred in a secondary distribution are greater than those in the ordinary sale. Lowndes and Kramer, supra, suggests that to

deny a taxpayer a deduction for costs, in effect, denies him blockage.

The problem is vexatious. Reference to the federal experience reflects that the courts have been split on this matter.[4] The analysis in these cases is similarly unconvincing.

After full consideration of this matter, however, we hold that the commissions and costs of sale are not an appropriate factor for consideration in determining fair market value. Our decision is based on the following analysis.

Assume that we were to value lots of only 100 shares and 1000 shares of Johnson stock. A blockage situation would, presumably, not be involved. Under such circumstances, we would, ordinarily, value the stock at the stock market quotation for that day and no thought would be given to commissions which would result from the sale of these shares. Yet, under the commission scale charged by brokers on transactions, the sales commission paid by the owner of 100 shares would be larger, per unit share, than would be the per-unit cost on the sale of 1,000 shares. This results from the fact that brokers employ a sliding scale of commissions based on the value of shares sold. Thus, there are varying commissions charged to different size blocks sold routinely through the normal procedure of the stock exchange. Indeed, the unit cost on the sale of very small lots sold through the New York Exchange may far exceed the unit cost of shares sold through secondary distributions. To give credit for sales commission to the owner of shares in a blockage situation,

[4] Cf. *Sewell L. Avery v. Commissioner of Internal Revenue*, 3 T.C. 963 and *Groff v. Munford*, 150 F. 2d 825 (1945) ; with *Robert L. Clause v. Commissioner of Internal Revenue*, 5 T.C. 647, aff'd 154 F. 2d 655 (1946).

while denying similar treatment to smaller shareholders, would be inequitable.[5]

The taxpayers contend, however, that in the secondary distribution, it is the underwriter who is buying the stock. The fact that he resells is irrelevant to the seller. This argument has great appeal. Nonetheless, were we to accept this argument, the seller under a secondary distribution would receive a benefit not available to the seller whose stock is liquidated gradually or sold under an exchange distribution. Under the latter two forms, ordinarily, the brokers receive sales commissions and are working on a best-efforts basis.

Moreover, the underwriter, in a secondary distribution, generally takes for resale, and his discount, in effect, represents his cost and commission. To characterize it otherwise would be to obscure the realities of the transaction.

In summary, we hold that blockage is applicable in considering the value of stock for personal property tax purposes. We find, however, that the testimony adduced at trial was insufficient to sustain the Court's order for the reasons stated herein. We recognize, of course, that both Court and counsel, in grappling with this new issue, were faced with great difficulties. We believe that they all demonstrated great skill and competence in exploring this uncharted area. For the reasons set forth herein, however, further testimony must be taken.

Order vacated and record remanded for further proceedings consistent with this opinion.

---

[5] A comparison might similarly be made with the real estate assessment area. Brokers often vary their commissions depending on the use of the land, its location, the amount of money involved, the size of the plot and many other factors. Yet, we give no credit for these cost variations in determining fair market value.

JACOBS, J., would affirm on the opinion of the lower court.

---

DISSENTING OPINION BY MONTGOMERY, J.:

From the joint research of the attorneys and the court, no precedent can be found for the application of the blockage rule in evaluating securities for personal property tax purposes. To me the reason is obvious. To do so would mean that factors not present, and therefore irrelevant, must be considered in making the evaluation. Those factors determine the effect the projected sale of the securities held by any *one* taxpayer might have on their value. Such effect might be depressionary or inflationary, depending on still other factors, viz., the manner of making the sale, the need of the holder to sell, the general condition of the security market at the particular moment of sale, the state of the general economy which in turn would be determined by still other factors, etc., ad infinitum.

In my opinion the only certainty in such a situation is the price at which the stock sold for on the exchange with which it is listed on the day it is to be evaluated for tax purposes. If it were not so the rule of uniformity so closely adhered to in tax assessment matters would be entirely ignored because the holder of one share—or 100 shares or 10,000 shares or 100,000 shares would be assessed on a different basis, at a different unit price. This error would be compounded each year as such assessments were remade, at which times each taxpayer could insist that his holding be considered on the basis of his individual holdings and as affected by other factors then existing. This would create an impossible situation and result in endless litigation.

In assessing the capital stock tax in Pennsylvania the actual value of each share is determined by a fixed formula. Blockage or a reduction in value because of

the possibility of disposing of a large issue is apparently not recognized, although market value is recognized. *Commonwealth v. Butler County National Bank,* 376 Pa. 66, 101 A. 2d 699 (1954) ; *Commonwealth v. Union Trust Company of Pittsburgh,* 237 Pa. 353, 85 A. 461 (1912). In the former case the following statement of the lower court was repeated, " 'The securities were not sold on or before December 31, 1945; therefore, no federal income tax was payable on the appreciation. The taxing officers need give no consideration to speculations concerning hypothetical contingencies.' " The same statement is applicable to the present case. The Board need not give consideration to the speculative effect of the hypothetical contingency of a bulk sale of appellants' holdings. See also *Commonwealth v. Mellon National Bank and Trust Company,* 420 Pa. 393, 217 A. 2d 391 (1966).

The best evidence of the value of a listed security is what it sells for on the open market on the day of the assessment. The opinion of "experts" under the circumstances would not only be the least reliable evidence but worthless for such purpose since they are based on pure speculation.

I would reverse the order of the lower court reducing this assessment by ten per cent of the price the stock sold for on the exchange and restore the assessment made by the Board at one hundred per cent of that price.

The taxpayers have expressed their opinion that their holdings are worth only seventy per cent of that value. The lower court determined it was but ninety per cent of same. Where do we arrive, except in a maze of uncertainty, if we deviate from the long recognized rule of evaluating securities at the price they sell for on the open market at the fixed date?

I respectfully dissent.

HANNUM, J., joins in this dissenting opinion.